45 P.3d 451 (2002)
181 Or. App. 1
STATE of Oregon, Respondent,
v.
Charles Robert CIANCANELLI, Appellant.
98CR2685FE; A108122.
Court of Appeals of Oregon, En Banc.
Argued and Submitted August 29, 2001.
Resubmitted March 6, 2002.
Decided April 24, 2002.
Meredith Allen, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, State Public Defender. Charles Robert Ciancanelli filed the supplemental brief pro se.
Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.
Before DEITS, Chief Judge, and EDMONDS, LANDAU, HASELTON, ARMSTRONG, LINDER, WOLLHEIM, KISTLER, and BREWER, Judges, and COLLINS, Judge pro tempore.
Resubmitted En Banc March 6, 2002.
LANDAU, J.
Defendant operates a business that offers live sex shows to the public. The state charged him with two counts of promoting unlawful sexual conduct in a public show, ORS 167.062, one count of promoting prostitution, ORS 167.012, one count of compelling prostitution, ORS 167.017, and two counts of using a child in a display of sexual conduct, ORS 163.670, arising out of the operation of that business. Before trial, he moved to suppress certain evidence that police obtained during a search of the premises. The *452 trial court denied the motion. Defendant also challenged the constitutionality of the two statutes that prohibit promoting unlawful sexual conduct in a public show and promoting prostitution, ORS 167.062 and ORS 167.012 respectively. According to defendant, the conduct of his business is protected by the free expression guarantees of Article I, section 8, of the Oregon Constitution, and the First Amendment to the United States Constitution. The trial court rejected those challenges as well. Defendant was convicted of the foregoing charges, and he now appeals, arguing that the trial court erred (1) in denying the motion to suppress, (2) in upholding the constitutionality of ORS 167.062, and (3) in upholding the constitutionality of ORS 167.012. We affirm as to the denial of the motion to suppress without further discussion. As to the constitutional challenges, we also affirm for the reasons that follow.
Because the state prevailed at trial, we state the evidence in the light most favorable to it. State v. Thompson, 328 Or. 248, 250, 971 P.2d 879, cert. den. 527 U.S. 1042, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999). Defendant operated Angels, an "adult-oriented" business in Roseburg that offered various "shows" to individuals or small groups. The customers would select a show, pay a fee, and retire to a small room in which the shows would be performed.
Two undercover officers visited Angels. They paid $100 to view a "toy show." A woman performer took them to a small room with a couch and a CD player. She started the music and performed a striptease. She masturbated and inserted her fingers into her vagina and her anus. She also inserted a dildo into her vagina. She continued those activities for 25 minutes. The officers gave the performer a tip and left.
The two officers returned the following week and paid to view a "two girl show" for $150. They were taken to a performance room, in which two women dressed in lingerie turned on some music, performed a striptease, sat on the officers' laps, and rubbed their breasts on the officers' chests. One of the women then inserted a dildo into her vagina, while the other manipulated it. The two kissed, touched each other, and engaged in oral sex with one another. Shortly after that performance, the officers obtained and executed a search warrant at Angels and arrested both defendant and the performers. Defendant was charged by indictment with the aforementioned offenses.
Before trial, defendant demurred to the indictment, arguing that ORS 167.062 and ORS 167.012 violate his rights of free expression guaranteed by the state and federal constitutions. Specifically, he argued that ORS 167.062 is overbroad and therefore facially invalid and that both statutes are unconstitutional as applied to this case. The trial court overruled the demurrers.
On appeal, defendant first assigns error to the trial court's decision on the demurrer to the charges brought under ORS 167.062. He argues, as he did to the trial court, that the statute is facially unconstitutional and unconstitutional as applied. In support of his argument under the state constitution, he relies on State v. House, 66 Or.App. 953, 676 P.2d 892, on recons. 68 Or.App. 360, 681 P.2d 173 (1984), aff'd. on other grounds 299 Or. 78, 698 P.2d 951 (1985), in which this court held that the portions of ORS 167.062 (1983) that prohibited public touching of the "genitals, pubic area or buttocks" were unconstitutionally overbroad. According to defendant, House now should be applied to strike down the balance of ORS 167.062. As for his argument under the federal constitution, defendant briefly contends that the statute fails because it is broader than necessary to further any legitimate state interest. Cited in support is Erie v. Pap's A.M., 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000).
The state replies that, as to defendant's arguments under the state constitution, House is distinguishable and, in any event, was wrongly decided. According to the state, our opinion in House failed to analyze the statute in accordance with State v. Robertson, 293 Or. 402, 412, 649 P.2d 569 (1982), and its progeny. Under the Robertson analysis, the state argues, we must first determine whether the statute regulates expression; if it does not, the inquiry ends, because Article I, section 8, protects only expression. In this case, the state argues, the statute in fact regulates only conductspecifically *453 "sexual conduct"not expression. Even assuming that the statute regulates expression, the state continues, under Robertson, the proper inquiry then is whether it regulates the content of the expression; if it does, then it is unconstitutional unless wholly contained within a historical exception to Article I, section 8. According to the state, in this case, the statute is indeed wholly contained within a historical exception. Thus, the state concludes, whether the statute is regarded as regulating expression or not, it does not violate Article I, section 8. As for defendant's arguments under the federal constitution, the state replies that, in Pap's A.M., the United States Supreme Court upheld the constitutionality of a local government prohibition on nude dancing.
ORS 167.062(3) provides that "[i]t is unlawful for any person to knowingly direct, manage, finance or present a live public show in which the participants engage in * * * sexual conduct." The term "live public show" means "a public show in which human beings, animals, or both appear bodily before spectators or customers." ORS 167.062(5)(a). "Public show," in turn, means "any entertainment or exhibition advertised or in some other fashion held out to be accessible to the public." ORS 167.062(5)(b). "Sexual conduct" means, among other things, "human masturbation, sexual intercourse * * * in an act of apparent sexual stimulation or gratification." ORS 167.060(10).
We begin with defendant's contention that ORS 167.062 violates the state constitution. At the outset, we note that defendant agrees that the statute applies to the conduct that we have described. Specifically, there is no debate that what the performers did was, in fact, "sexual conduct" and that the performers engaged in that conduct in a "public show," as those terms are defined in the relevant statutes.[1]
Article I, section 8, of the Oregon Constitution, provides:
"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."
The constitution thus prohibits restraints on expression. The question whether conduct may be "expression" protected by state or federal free speech guarantees is a notoriously difficult one. See, e.g., Laurence H. Tribe, American Constitutional Law § 12-7, 825-32 (2d ed. 1988) (detailing difficulties with drawing a distinction between speech and conduct). All speech is conduct in some sense; likewise much conduct is expression in the sense that it communicates an opinion or a message. Under Oregon law, however, merely because conduct is expressive does not necessarily establish that it is protected by Article I, section 8. In Huffman and Wright Logging Co. v. Wade, 317 Or. 445, 857 P.2d 101 (1993), for example, six members of "Earth First!" climbed on top of and chained themselves to logging equipment from which they suspended a large banner that read: "FROM HERITAGE TO SAWDUST EARTH FIRST!" When the owner of the logging equipment obtained compensatory and punitive damages in an action for trespass, the defendants challenged the constitutionality of the verdict, arguing that their conduct was expression protected under Article I, section 8. The court stated that,
"[a]lthough those acts undoubtedly had a communicative effect, in the sense that most purposive human activity communicates something about the frame of mind of the actor, the acts were conduct, not speech."
Id. at 449-50, 857 P.2d 101.
In this case, defendant contends that the statute restrains expression protected by Article I, section 8, because it prohibits sexual conduct in a public show. According to defendant, *454 any performance before an audience is expressive. In our view, the question is not so simply resolved. As Huffman and Wright Logging Co. makes clear, merely engaging in conduct to attract the attention of an audience does not necessarily transform the conduct into protected expression. Homicide, for example, is conduct. Performing it in front of an audience does not transform it into protected expression.
We need not determine, however, whether defendant's conclusion that ORS 167.062 prohibits expression nevertheless is correct. Even assuming that the statute restrains expression, we conclude that the restraint does not run afoul of Article I, section 8.
At the outset, we must determine the proper analysis under Article I, section 8. The parties assume that the analysis is dictated by Robertson and its progeny. In Stranahan v. Fred Meyer, Inc., 331 Or. 38, 54-55, 11 P.3d 228 (2000), however, the Supreme Court held that provisions of the original Oregon Constitution are subject to the constitutional analysis described in Priest v. Pearce, 314 Or. 411, 415-16, 840 P.2d 65 (1992), the focus of which is the "intent of the framers * * * and of the people who adopted it." Stranahan, 331 Or. at 54, 11 P.3d 228. In particular, the court held that that method of analysis applies to Article I, section 8. Id. at 66 n. 19, 11 P.3d 228. The court did not mention Robertson, under which analysis of Article I, section 8, is somewhat different. The court declined actually to apply Priest to Article I, section 8, in that case, because the parties had neglected to provide it with any briefing as to the intended meaning of that section with respect to the dispute in that case. Stranahan, 331 Or. at 66 n. 19, 11 P.3d 228.
We conclude that Robertson still controls our disposition of cases arising under Article I, section 8. Although the Supreme Court has suggested thatat least in the abstracta different method of analysis applies, the fact remains that it has not overruled Robertson. Moreover, as in Stranahan, the parties in this case have not argued that anything other than Robertson applies in this case. Lacking any assistance from the parties, we decline to undertake on our own an analysis of Article I, section 8, that departs from the method set out in Robertson.
In Robertson, the Supreme Court explained:
"Article I, section 8 * * * forbids lawmakers to pass any law `restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever,' beyond providing a remedy for any person injured by the `abuse' of this right. This forecloses the enactment of any law written in terms directed to the substance of any `opinion' or any `subject' of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach. Examples are perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants."
293 Or. at 412, 649 P.2d 569 (footnote omitted). That means that we are required to determine (1) whether there was a restriction on expression that was "well-established"[2] during the relevant historical period;[3] and, if *455 so, (2) whether the challenged statute falls "wholly within" that historical exception. If ORS 167.062 wholly falls within a historical exception to Article I, section 8, our analysis ends.[4]
Regulation of public sexual conduct which commonly was understood to include even public nudityhas been a regular feature of the legal landscape for several hundred years, at least as early as 1663,[5] when Sir Charles Sydlye was fined for "showing himself naked on a balcony" and throwing bottles of urine at the public below "contrà pacem, and to the scandal of the Government." Sir Charles Sydlyes Case, 83 Eng. Rep. 1146, 1147 (KB 1663).[6] William Blackstonewhose commentaries on the English common law were so influential to the development of American law[7]noted that "open and notorious lewdness" was "cognizable by the temporal courts." William Blackstone, 4 Commentaries on the Laws of England, 64 (Chitty ed., vol 2, 1870). Such indictable conduct included "frequenting houses of ill-fame" and "[e]xposing a party's person to the public view." Id. at 64 n. 25. Parliament enacted a statute that declared a man who exposed his "Person" to a woman was punishable as "a Rogue and Vagabond." 5 Geo IV, ch. 83, § 4 (1824), reprinted in 64 The Statutes at Large of the United Kingdom of Great Britain and Ireland, 5 George IV 1824, 382 (1824). The mere act of stripping to bathe in the sea, without any other act of "wanton indecency," apparently was enough to provoke the attention of the English criminal justice system. Rex v. Crunden, 170 Eng. Rep. 1091, 1091 (KB 1809). "The law will not tolerate such an exhibition," the court held. Id. "Whatever his intention might be, the necessary tendency of his conduct was to outrage decency, and to corrupt the public morals." Id.
The American colonies picked up where the English left off. Indeed, early colonists, *456 particularly New England puritans,[8] devoted an extraordinary amount of energy to the regulation not only of public immorality, but also of entirely private sexual conduct, including adultery, fornication, buggery, and with particular zealbestiality. See generally Kermit L. Hall, The Magic Mirror: Law in American History, 32-33 (1989). By the mid-nineteenth century, nearly every state recognized the crime of public indecency or public lewdness. As Lawrence Friedman observed, in the enactment of these laws,
"the republican period carried on a rich, colonial tradition, committed to sexual control (or, more accurately, repression). There was no abrupt break with the past. By law, only married people were entitled to any kind of sex life at all, and only within narrow limits. Everything else was not only a sin, it was a crime. * * * Adultery was a crime, as were fornication, incest, and (of course) `the detestable crime against nature, committed with mankind or with a beast'a crime so awful it was not even described, though presumably most people knew what was meant. Any `open, gross lewdness and lascivious behavior' was also an offense. Similarly, it was a crime to cater to other people's lewdness."
Lawrence M. Friedman, Crime and Punishment in American History, 127-28 (1993) (footnotes omitted).
The specific language of early nineteenth-century laws varied. Some, such as Arkansas's, specifically prohibited public nudity or "obscene exhibitions" of the body:
"Every person who shall appear in public places naked, or partly with the intent of making a public exhibition of his nudity, or who shall make any obscene exhibition of his person, shall be deemed guilty of a misdemeanor."
Stat. Ark., ch. 51, art. VIII, § 1, p. 377 (1858); see also Rev. Stat N.H., title XIV, ch. 113, § 6, p. 221 (1843) (prohibiting nudity in view of any house or road "for the purpose of swimming or bathing, or otherwise, without necessity"); N.Y. Penal Code, title X, ch. VII, § 363(1), p. 134 (1865) (Field Code) (any person who "[e]xposes his person, or the private parts thereof" or procures another to do so is guilty of misdemeanor). Others prohibited any "open," "notorious," or "public lewdness." See, e.g., Rev. Stat. Ill., ch. 30, § 127, p. 174 (1845) (prohibiting "open lewdness, or other notorious act of public indecency"); Ind. Rev. Stat. § 22, p. 433 (1852) (prohibiting "notorious lewdness or other public indecency"); Stat. Laws Terr. Iowa Courts, § 86, p. 165 (1839) (prohibiting "open lewdness, or other notorious act of public indecency"); Rev. Stat. Me., ch. 124, § 5, p. 684 (1857) (prohibiting "open, gross lewdness and lascivious behavior"); Gen.Stat. Mass., ch. 165, § 6, p. 818 (1864) (prohibiting "open and gross lewdness and lascivious behavior"); Pa. Laws, title IV, § 44, p. 394-95 (1860) (prohibiting "open lewdness, or any notorious act of public indecency"); Vt. Rev. Stat, ch. 99, § 8 (1846) (prohibiting "open and gross lewdness and lascivious behavior"); Va. Code, title 54, ch. 197, § 7, p. 804 (1849) (prohibiting "open and gross lewdness and lasciviousness"). Still others prohibited "lascivious carriage," obviously referring to something other than a horse-drawn buggy. See, e.g., Conn. Stat., title 21, § 79, p. 138 (1835) (prohibiting "lascivious carriage and behavior").
*457 Oregon was no different. In 1854, the Territorial Legislature prohibited "open and gross lewdness and lascivious behavior." Rev. Stat. Terr. O.r, An Act to Define Crimes and Misdemeanors, and Regulate Criminal Proceedings, ch. 11, § 4, p. 210 (1854). A decade later, the legislature got more specific:
"If any person shall wilfully and lewdly expose his person or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby, * * * or make any other exhibition of himself to public view, or to the view of any number of persons, such as is offensive to decency, or is adapted to excite vicious or lewd thoughts or acts, such person, upon conviction thereof, shall be punished by imprisonment in the county jail, not less than three months, nor more than one year, or by fine not less than fifty, nor more than five hundred dollars."
General Laws of Oregon, ch. 48, § 632, p. 559 (Deady 1845-1864).[9]
Nineteenth-century legislatures did not stop at public sexual conduct, either. Even private sexual conduct was considered well within the regulatory prerogatives of the state at the time. Statutes prohibiting a man and woman living together "in adultery or fornication" were commonplace. See, e.g., Rev. Stat. Me., ch. 124, § 5, p. 684 (1857) (unmarried persons may not "lewdly and lasciviously cohabit"); Gen. Stat. Mass., ch. 165, § 6, p. 818 (1864) (unmarried persons may not "lewdly and lasciviously associate and cohabit together"); Miss. Code, ch. 64, § 58, p. 939 (1848) (prohibiting "adultery or fornication"); Va. Code, title 54, ch. 197, § 7, p. 740 (1849) ("any white persons, not married to each other, [may not] lewdly and lasciviously associate and cohabit together"); see also Donal E.J. MacNamara & Edward Sagarin, Sex, Crime, and the Law, 186 (1977) (fornication eventually was made illegal in all jurisdictions in America).
True, in many instances, state statutes did not precisely define the terms "lewd," "lascivious," or "indecent." Courts and legislators of the time were notoriously concerned with "the chastity of our records," Commonwealth v. Sharpless and others, 2 Serg. & Rawle 91, 103 (Pa.1815), and were disinclined to describe sexual conduct in any detail. See, e.g., The People v. Girardin, 1 Mich. 90, 91 (1848) ("Courts will never allow [their] records to be polluted by bawdy and obscene matters."). Nevertheless, it is entirely possibleindeed, it is easyto conclude that the terms included the sort of conduct at issue in *458 this case, that is, public sexual intercourse and masturbation.
Mid-nineteenth-century dictionaries defined the term "lewd" in sexual terms: "Given to the unlawful indulgence of lust; addicted to fornication or adultery; dissolute; lustful; libidinous." Noah Webster, 2 An American Dictionary of the English Language (1828).[10] Bouvier's 1839 law dictionary was even more explicit. With obvious reference to Sydlye and Crunden, it defined the term "indecency," explaining: "The following are examples of such indecency, namely, the exposure by a man of his naked person on a balcony, to public view, or bathing in public." John Bouvier, 1 A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union, 492 (1839).
Early treatises similarly report that lewdness and indecency referred to sexual conduct and, in particular, public nudity. Wharton, for example, explains that "[a]n indecent exposure of person to public view is an indictable offence." Wharton, A Treatise on the Criminal Law of the United States at 804. Wharton noted that it likewise was a crime for a master to permit his servant "to pass about in the public highway in a state of nakedness." Id. at 805. Bishop observed with reference to earlier cases that there is no doubt that lewdness "includes illicit sexual intercourse, and the irregular indulgence of lust, whether public or private." Joel Prentiss Bishop, Commentaries on the Law of Statutory Crimes § 716, p. 459 (1873); see also Russell, A Treatise on Crimes and Misdemeanors at 325 ("In general, all open lewdness grossly scandalous is punishable by indictment at the common law: and it appears to be an established principle that whatever openly outrages decency, and is injurious to public morals, is a misdemeanor.").
Nineteenth-century case law reflects the universal understanding that prohibitions on "lewd" and "indecent" conduct included, at the very least, sexual conduct and, in particular, public nudity. The Indiana Supreme Court's decision in McJunkins v. The State, 10 Ind. 140 (1858), is illustrative. In that case, the court acknowledged that the term "public indecency" is "vague and indefinite." Id. at 145. Nevertheless, the court held, it had commonly come to be understood by the courts to mean "public displays of the naked person, [and] the publication, sale, or exhibition of obscene books and prints." Id.[11] Similarly, in Britain v. The State, 22 Tenn. (3 Hum.) 203, 204 (1842), the defendant was convicted of "lewdness" for "permitt[ing] his slaves to go about the country in * * * a state of nakedness." Likewise, in State v. Roper, 18 N.C. (1 Dev. & Bat.) 208, 209 (1835), the court upheld a conviction for indecent exposure based on the defendant's public nudity, commenting that "[a] public exposure of the naked person, is among the most offensive of those outrages on decency and public morality." See also The State v. Mary Hazle, 20 Ark. 156, 159 (1859) (public nudity is an indictable offense); Commonwealth v. Lambert, 94 Mass. (12 Allen) 177, 179 (1866) ("We have no doubt that [lewdness] includes illicit sexual intercourse, and the irregular indulgence of lust, whether public or private."); Miller v. The People, 5 Barb. 203, 205 (N.Y. 1849) (public nudity requires intent); State v. Millard, 18 Vt. 574, 577-78 (1846) (public exposure of a person's genitals "is lewd, and is gross lewdness * * * [and] was a proper subject for the animadversion of criminal jurisprudence").
It may be objected that we have failed to report any statutes that directly parrot the language of ORS 167.062 in prohibiting public sexual intercourse and masturbation. That is true. We nevertheless do not hesitate to conclude that the framers in mid-nineteenth-century Oregon understood that the state had the authority to regulate public sexual conduct such as sexual intercourse and public exposure of the genitals. We reach that conclusion for several reasons.
*459 First, we do not read Robertson to require such a historical "smoking gun." To the contrary, the Oregon Supreme Court emphasized that a historical exception does not consist of a particular statutory prototype, but instead of a well-established principle of law evidenced by, among other things, statutes and case law from the relevant times. Robertson, 293 Or. at 434, 649 P.2d 569. Thus, in the cases decided since Robertson, the Oregon Supreme Court has canvassed a wide array of historical sources from which to draw inferences about the framers' intentions. In Henry, for example, the court examined literature, statutes, cases, and treatises from the seventeenth and eighteenth centuries to determine whether there existed a well-established historical exception for the regulation of "obscene" publications. 302 Or. at 515-23, 732 P.2d 9. Similarly, in State v. Moyle, 299 Or. 691, 696, 705 P.2d 740 (1985), the court examined precedents from both English and American legal history from the early-eighteenth to the mid-nineteenth centuries to determine whether the state constitution was intended to protect nonextortionate written threats. In this case, we have followed the same analytical approach, examining English and American precedents from the seventeenth to the nineteenth centuries to determine what the framers most likely intended with respect to the regulation of sexual conduct.
Second, relevant historical sources repeatedly attest to the authority of the state to regulate "lewd," "lascivious," and "indecent" behavior and explicitly define those terms to include sexual intercourse. See, e.g., Bishop, Commentaries on the Law of Statutory Crimes § 716 at 459 (noting with reference to prior case law that lewd behavior "includes illicit sexual intercourse, and the irregular indulgence of lust, whether public or private"); see also Lambert, 94 Mass. (12 Allen) at 179 ("We have no doubt that [lewdness] includes illicit sexual intercourse * * * whether public or private.").
Third, apart from that, eighteenth- and nineteenth-century statutes and case law reflect the widespreadif not universalregulation of public exposure of the genitals. See, e.g., General Laws of Oregon, ch. 48, § 632, p. 559 (making it a crime for any person to "lewdly expose his person or the private parts thereof"). Logically, that evidence leads to one of two possible conclusions about the framers' intentions with respect to the regulation of sexual intercourse and masturbation. On the one hand, it could be inferred that, because the framers so relentlessly prohibited even as little as public nudity, it necessarily follows that public intercourse and masturbation would have been regarded as even more odious and even more obviously subject to state regulation. On the other hand, it could be inferred that, although the framers understood that public nudity could be regulated, they apparently understood that public nudity while engaged in intercourse or masturbation could not (or that both were permissible as long as the offenders kept their clothes on). Frankly, given the evidence that we have described about antebellum public morals, statutes, and case law, we find the latter possibility to be remote, to say the least.
Fourth, there is likewise abundant evidence of the regulation of even private adultery and fornication in the mid-nineteenth century. See, e.g., Miss. Code, ch. 64, § 58 (prohibiting "adultery or fornication"). We find it highly unlikely that the framers would have understood that, although the state legitimately could regulate private adultery and fornication, public sexual conduct was protected expression.
It also may be objected that the ubiquity of nineteenth-century sexual conduct laws does not necessarily reflect the extent to which those laws were enforced. Friedman, for example, observes that, in the early nineteenth century, private sexual conduct statutes do not appear to have been vigorously enforced. Friedman, Crime and Punishment in American History at 128. He also notes, however, that, while enforcement attitudes changed with respect to wholly private sexual conduct such as fornication and adultery, nineteenth-century attitudes towards public sexual conduct remained unchanged. Id. at 130.[12] Moreover, for our purposes, the *460 point is not whether sexual conduct laws were enforced; rather, it is whether the framers believed that the state had the authority to enforce them. No one questioned that in the early nineteenth century.
Constitutional challenges to the authority of the state to regulate public sexual conduct, in fact, were unknown before the Civil War.[13] The conventional view is that the notion that the state or federal government lacked the constitutional authority to regulate that sort of conduct was not suggested until well after the turn of the twentieth century. See, e.g., Bradley C. Bobertz, The Brandeis Gambit: The Making of America's "First Freedom," 1909-1931, 40 Wm. & Mary L. Rev. 557, 559 (1999) ("At the end of the nineteenth century, the most remarkable aspect of our `first freedom' was that practically no one talked about it, wrote about it, or sued to enforce it."); G. Edward White, The First Amendment Comes of Age: The Emergence of Free Speech in Twentieth-Century America, 95 Mich. L. Rev. 299 (1996) (tracing origins of new conceptions of free speech in early twentieth century).[14] More revisionist historical scholarship suggests that, at the earliest, such "libertarian radicalism" emerged in the last decade of the nineteenth century. See generally David M. Rabban, Free Speech in Its Forgotten Years, 23-77 (1997) (tracing origins of new conceptions of free speech theory to the Free Speech League and its turn-of-the-century opposition to the Comstock Act of 1873). Even then, the focus was on the constitutional protection of private, not public, sexual conduct. Id.[15]
In short, however quaint it may seem to us a century and a half later, the historical record establishes beyond peradventure that the framers of the Oregon Constitution did not understand Article I, section 8, to provide protection against state regulation of public sexual intercourse and masturbation. To the contrary, the notion that the state or federal constitution protected public sexual conduct was unknown until well into the twentieth century. We therefore conclude that the regulation of that same conduct under ORS 167.062 is wholly contained within a well-established historical exception.
Judges Brewer and Armstrong, in separate opinions, disagree. We note that neither contests our essential thesisthat the framers did not understand public sexual intercourse or masturbation to be constitutionally protected. They simply assert that, *461 for a number of reasons, that historical fact does not matter.
Judge Brewer first complains that we have inappropriately assumed that the conduct at issue in this caseconduct "that occurred in a small room in an establishment that can be seen only by patrons who have paid to be there"would have been regarded as "public" in the mid-nineteenth century. 181 Or. App. at 39, 45 P.3d at 472 (Brewer, J., concurring in part and dissenting in part).
To begin with, we note that, in making the foregoing assertion, Judge Brewer misses the point that, as of 1857, both public and private sexual conduct had been regulated by the state without question of constitutionality. See, e.g., Hazle, 20 Ark. at 158 (to prove "obscene exhibition" "the place need not be public"); Sharpless, 2 Serg. & Rawle at 101 (although indictment charged indecency in a "public shop [,] * * * that can make no difference") (emphasis in original).[16]
But aside from that, Judge Brewer simply is wrong in asserting that what ORS 167.062 prohibitsthat is, sexual conduct performed during any "entertainment or exhibition" that is "accessible to the public" would not have been considered "public" in the mid-nineteenth century. "Public" houses commonly were understood to refer to places open to the public for entertainment. E.g., Webster, 2 An American Dictionary (1828); Alexander M. Burrill, 2 A Law Dictionary and Glossary, 352 (1867). Bishop similarly reports that "any place may be made public by a temporary assemblage," and the fact that some people are excluded from a room does not "prevent its being such." Joel Prentiss Bishop, 1 Commentaries on the Criminal Law, § 181, 225-26 (1858). Courts likewise held that rooms in which members of the public paid to view sexual conduct were "public." Directly on point in that regard is People v. Bixby, 67 Barb. 221 (N.Y. 1875). In that case, five men paid money to watch a group of women engage in "indecent exposure" in a closed room in a brothel. Citing Bishop's 1858 treatise, the court concluded that the room was "public": "Any place may be made public by a temporary assemblage[,] and this is especially so when the assemblage is gathered to witness an exhibition for hire." Bixby, 67 Barb. at 222.
Judge Brewer then turns his attention to the extent to which we have demonstrated that ORS 167.062 is "wholly contained" within a historical exception. He insists that we must establish the precise boundaries of the historical exception before we may know whether the modern statute is wholly contained within it. 181 Or.App. at 40, 45 P.3d at 472 (Brewer, J., concurring in part and dissenting in part). Judge Brewer never explains why that is so, however. As a matter of logic, he is incorrect. Merely because we do not know the boundaries of a lake does not mean that we cannot say with confidence that a stone is wholly contained within it. More important, as a matter of precedent, he likewise is incorrect; as we have noted, Robertson expressly provides that an exact fit with a specific historical statutory prototype is not required. 293 Or. at 434, 649 P.2d 569.
Judge Brewer also insists that we have misconstrued what qualifies as a "historical exception" under Article I, section 8. "True" historical exceptions, he says, "do not trap us in a time warp of our own device." Instead, he argues,
"they reflect timeless and unstinting values whose pedigree is so patent that there is no occasion to conjure their meaning or contours."
181 Or.App. at 41, 45 P.3d at 473 (Brewer, J., concurring in part and dissenting in part). Thus, says Judge Brewer, the historical exception that we have identified is unacceptable, because it "makes no sense in light of contemporary standards of tolerance." 181 *462 Or.App. at 41, 45 P.3d at 473 (Brewer, J., concurring in part and dissenting in part).
Here, Judge Brewer veers especially wide of the mark. He relies on contemporary standards of decency to evaluate whether an otherwise well-established exception is truly "historical." That is impossible to reconcile with Robertson and its progeny, in particular, Moyle and Henry.[17]Robertson does trap us in a "time warp." That is why it refers to a "historical" exception, defined in terms of what the framers in 1857not modern-day judges examining statutes through the lens of twentieth-century moral sensibilities thought about the scope of state authority. See, e.g., In re Lasswell, 296 Or. 121, 124, 673 P.2d 855 (1983) (regulation of speech is unconstitutional unless it falls within "a historically established exception" that the framers did not intend to abandon upon adoption of the constitution). Henry, for example, would have been a much differentand shorter opinion, were Judge Brewer correct. The Supreme Court spent a considerable amount of effort evaluating cases and statutes from the seventeenth to the nineteenth centuries to determine what the framers of the Oregon Constitution thought about the regulation of obscenity. Not once did the court appeal to contemporary morality in evaluating the regulation of obscenity as a well-established historical exception.
Judge Brewer attempts to draw support for his novel analysis from familiar criticism of originalism in general, namely, that the framers sometimes were "intolerant, narrow-minded, and bigoted" and that reliance on their intentions "inevitably will lead to results that make no sense" to the modern citizenry. 181 Or.App. at 41-42, 45 P.3d at 473 (Brewer, J., concurring in part and dissenting in part).[18] We will not debate the merits of a jurisprudence of original intent, however. For our purposes, that debate is irrelevant. The Oregon Supreme Court plainly has described the exception analysis under Article I, section 8, in historicalnot contemporaryterms. Any concerns as to the propriety of the analysis must await the Supreme Court's reexamination of its own case law. Perhaps this case will present an opportunity for the court to do that. In the meantime, we are persuaded that what we have described and applied is what the court's cases require.
Judge Brewer also claims support for his approach in our decision in House. 181 Or. App. at 40, 45 P.3d at 472 (Brewer, J., concurring in part and dissenting in part). Candor requires us to acknowledge that House, indeed, employed an approach similar to the dissent's. House also is plainly wrong. This court held that the statutory prohibition on public touching of the genitals was unconstitutionally overbroad, scarcely mentioning Robertson, much less applying it. In particular, the court never addressed the question whether the challenged statute was wholly contained within a well-established historical exception. Instead, after listing a number of contemporary theatrical works that conceivably could run afoul of the statute, the court simply declared, ipse dixit, that the statute obviously was overbroad. House, 66 Or.App. at 958, 676 P.2d 892.[19]House, like Judge Brewer's analysis, cannot be reconciled with Robertson or any other subsequent Supreme *463 Court decision concerning Article I, section 8.[20]
Next, Judge Brewer takes us to task for failing "to come to terms with what the Supreme Court held in Henry." 181 Or.App. at 43, 45 P.3d at 474 (Brewer, J., concurring in part and dissenting in part). That is an interesting complaint, given that what he proposes is irreconcilable with Henry. But aside from that, Judge Brewer once again is mistaken.
In Henry, the Supreme Court rejected the state's argument that there was a well-established historical exception for the regulation of obscene publications generally. The court held that, although there may well be a historical exception for the regulation of narrower forms of expressiondistribution of obscene materials to "unwilling viewers, captive audiences, minors and beleaguered neighbors," for examplethere was none for obscenity generally. 302 Or. at 525, 732 P.2d 9. More than once the court emphasized the narrowness of its holding, that is, the rejection of an "all-encompassing historical exception" for obscene publications generally. Id. at 523, 732 P.2d 9. The court did not address the regulation of public indecency, public lewdness, or public shows of sexual conduct, much less hold that there exists no well-established historical exceptions for the regulation of such conduct. Nothing in Henry forecloses our conclusion that an entirely different statute is wholly contained within an entirely different historical exception than the court passed on in that case.[21]
Finally, Judge Brewer complains that, if we are correct about the constitutionality of state regulation of public nudity, then, under Pap's A.M. and Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), regulations of expressive conduct that are permitted by the Oregon Constitution would be prohibited by the First Amendment. 181 Or.App. at 44, 45 P.3d at 474 (Brewer, J., concurring in part and dissenting in part). That is a curious argument, indeed, for in both Pap's A.M. and Barnes, the United States Supreme Court upheld the constitutionality of statutes prohibiting nude dancing. What is more, in Barnes, the Court noted that the Indiana public indecency statute at issue in that case was constitutional precisely because, for centuries, the courts have recognized states' legitimate interest in protecting public morality. The Court even went so far as to cite Sydlye:
"The public indecency statute is clearly within the constitutional power of the State and furthers substantial governmental interests. * * * [T]he statute's purpose of protecting societal order and morality is *464 clear from its text and history. Public indecency statutes of this sort are of ancient origin and presently exist in at least 47 States. Public indecency, including nudity, was a criminal offense at common law, and this Court recognized the common-law roots of the offense of `gross and open indecency,' in Winters v. New York, 333 U.S. 507, 515[, 68 S.Ct. 665, 92 L.Ed. 840] (1948). Public nudity was considered an act malum in se. LeRoy v. Sidley, [83 Eng. Rep. at 1146-47.] Public indecency statutes such as the one before us reflect moral disapproval of people appearing in the nude among strangers in public places."
Barnes, 501 U.S. at 567-68, 111 S.Ct. 2456. Our decision certainly does not conflict with that analysis.[22]
But even assuming that a necessary implication of our analysis is that some regulations permitted by the Oregon Constitution turn out to be prohibited by the federal constitution, it is entirely unclear to us why that means that our analysis is wrong. Judge Brewer appears to assume that the Oregon Constitution must be more protective of individual rights than the federal constitution. There is, however, no basis whatever for that assumption.[23]
Judge Armstrong echoes Judge Brewer's contention that the outcome of this case is controlled by Henry. 181 Or.App. at 50-51, 45 P.3d at 478 (Armstrong, J., dissenting). As we have noted, however, Henry was a narrow decision, involving a different historical exception and a different statute. Judge Armstrong also claims support from this court's decision in State v. Maynard, 168 Or.App. 118, 5 P.3d 1142 (2000), rev. den. 332 Or. 137, 27 P.3d 1043 (2001), which he reads as having rejected the same historical analysis on which we rely in this case. 181 Or. App. at 50-51, 45 P.3d at 478 (Armstrong, J.). Once again, Judge Armstrong neglects to understand that this case involves a different historical exception and a different statute from the ones at issue in Maynard. Moreover, he ignores the fact that the majority in Maynard held only that it was not necessary to address whether the statute at issue in that case was wholly contained within a well-established historical exception. See Maynard, 168 Or.App. at 137, 5 P.3d 1142 (criticizing the dissent for following a "different method of analysis, which causes it to detour into an unnecessary examination of the historical exception doctrine").
Judge Armstrong next complains that our historical analysis is flawed because it is based on an examination of laws regulating both expression and conduct. According to Judge Armstrong, the only historical evidence that "matters" is evidence of nineteenth-century statutes that restrict expression. 181 Or.App. at 51, 45 P.3d at 478 (Armstrong, J., dissenting). That, as we have noted, is simply incorrect. Robertson itself cautions that the historical exception *465 analysis is not limited to searching for particular statutory prototypes. 293 Or. at 434, 649 P.2d 569. Instead, the proper focus is on the intentions of those who adopted the constitution, gleaned from any historical materials that shed light on those intentions. Id. at 412, 649 P.2d 569 (proper focus is what the framers intended with respect to the scope of Article I, section 8).[24] Thus, in cases following Robertson, the Supreme Court has examined a wide array of historical sources involving regulations of conduct as well as speechto determine the intentions of the framers. See, e.g., Henry, 302 Or. at 515-25, 732 P.2d 9.
Judge Armstrong finally complains that our historical analysis is unnecessary, because the crimes at issue in this case are not "conventional crimes." 181 Or.App. at 53, 45 P.3d at 479 (Armstrong, J., dissenting). That, however, simply is not the analysis that is reflected in any of the Supreme Court's cases since Robertson. Indeed, if Judge Armstrong were correct, then the extensive historical analysis in Henry amounts to entirely unnecessary dictum. We find no support for that reading of the case.
Because the challenged portions of ORS 167.062 are wholly contained within a well-established historical exception, we conclude that defendant's Article I, section 8, challenge fails. That leaves his First Amendment challenge to the statute, which may be disposed of with much less discussion.
According to defendant, ORS 167.062 violates the First Amendment, because it amounts to a regulation of expression that is broader than necessary to serve any legitimate government interest. Defendant cites in support of that argument the United States Supreme Court's decision in Pap's A.M. Defendant fails to point out that, in that case, the Supreme Court upheld a local government ordinance prohibiting nude dancing as against a First Amendment challenge. Four members of the Court concluded that nude dancing "falls within the outer ambit of the First Amendment's protection." 529 U.S. at 289, 120 S.Ct. 1382. But the Court also concluded that the ordinance amounted to a de minimis intrusion on expression that was justified by the local government's legitimate interest in protecting public health and welfare. Id. at 296-97, 120 S.Ct. 1382. Two other members of the Court concluded that the conduct involved did not even amount to expression subject to the protection of the First Amendment. Id. at 307-10, 120 S.Ct. 1382 (Scalia and Thomas, JJ., concurring). Defendant does not explain, and we do not understand, how public sexual intercourse and masturbation can fare better under the First Amendment than nude dancing did in Pap's A.M.
Defendant next assigns error to the trial court's decision on his demurrer to the charges brought under ORS 167.012, prohibiting promoting prostitution. That statute provides, in part:
"A person commits the crime of promoting prostitution if, with intent to promote prostitution, the person knowingly:
"(a) Owns, controls, manages, supervises or otherwise maintains a place of prostitution or a prostitution enterprise[.]"
ORS 167.012(1). "Prostitution," in turn, occurs when
"(a) The person engages in or offers or agrees to engage in sexual conduct or sexual contact in return for a fee; or
"(b) The person pays or offers or agrees to pay a fee to engage in sexual conduct or sexual contact."
ORS 167.007(1). For the purposes of the prostitution statutes, "sexual conduct" refers to "sexual intercourse or deviate sexual intercourse," ORS 167.002(4), and "sexual contact" refers to "any touching of the sexual organs or other intimate parts of a person *466 not married to the actor for the purpose of arousing or gratifying the sexual desire of either party," ORS 167.002(5).
There is no argument that defendant's conduct did not amount to promoting prostitution as defined in ORS 167.012. Defendant's sole contention is that the statute violates Article I, section 8, because it targets expression. According to defendant, because the performers were engaged in protected expression, defendant's promotion of that expression also must be protected by Article I, section 8.
The state argues that defendant simply is incorrect in asserting that the performers were engaged in protected expression, much less that his promotion of that conduct is protected expression as well. In any event, the state argues, the promotion of prostitution is wholly contained within a historical exception to the guarantee of free expression reflected in Article I, section 8.
We agree with the state that, even assuming that promoting prostitution is protected expression, the fact remains that it is wholly contained within a historical exception to Article I, section 8. Regulation of the "most ancient profession in the world"[25] is probably as old as the profession itself. See, e.g., Deuteronomy 23:17-18. In the context of the Anglo American legal system, it dates back at least to the thirteenth century, when Edward I ordered that no "femme coursable" should dwell within the city of London. See generally Frederick Pollock & Frederic William Maitland, 2 The History of English Law, 543 n. 5 (2d ed. 1898).[26] What is more, English law did not target solely the "night walkers" themselves; it also regulated those who promoted the business. As Blackstone reported, at common law, "bawdy-houses" were considered to be "public nuisances, and may upon indictment be suppressed and fined." 4 Commentaries at 168; see, e.g., Regina v. Williams, 91 Eng. Rep. 334 (QB 1712) (husband and wife held jointly liable for renting out room to be used for prostitution); Regina v. Pierson, 91 Eng. Rep. 333 (QB 1706) (indictment upheld for permitting room to be used for prostitution).
In the American colonies, particularly as the development of maritime trade spurred the development of coastal cities in the eighteenth century, prostitution and the maintenance of bawdy-houses became a common concern of state and local governments. See generally D'Emilio & Freedman, Intimate Matters: A History of Sexuality in America at 50-52. By the mid-nineteenth century, every state and every major city outlawed the keeping of houses of prostitution. See generally Friedman, Crime and Punishment in American History at 224.
Examples of antebellum state statutes include the following: Conn. Stat., title 21, § 87, pp. 324-25 (1854) (prohibiting keeping "a house of ill fame, resorted to for the purposes of prostitution, or lewdness"); Rev. Stat. Ill., ch. 30, § 127, 174 (1845) (prohibiting keeping "a lewd house or place for the practice of fornication"); Stat. Laws Terr. Iowa, Courts, § 86, p. 165 (1839) (prohibiting keeping "a lewd house or place for the practice of fornication"); Rev. Stat. Me., ch 124, § 9, p. 685 (1857) (prohibiting keeping "a house of ill-fame, resorted to for the purpose of prostitution or lewdness"); Rev. Stat. Mass., ch. 130, § 8, p. 740 (1836) (prohibiting keeping "a house of ill fame, resorted to for the purpose of prostitution or lewdness"); Stat. Minn., ch. 96, § 9, p. 729 (1859) (prohibiting keeping "a house of ill fame, resorted to for the purpose of prostitution or lewdness"); Pa. Laws, title IV, § 43, p. 394 (1860) (prohibiting keeping "a common bawdy house, or *467 place for the practice of fornication"); Rev. Stat. R.I., title XXX, ch. 216, § 6, p. 543 (1857) (prohibiting keeping "a house of ill fame, resorted to for the purpose of prostitution or lewdness"); Va. Code, title 54, ch. 196, § 10, p. 740 (1849) (prohibiting keeping "a house of ill-fame, resorted to for the purpose of prostitution or lewdness"). Oregon was among the states that recognized the offense as a matter of statute. Rev. Stat. Terr. Or., An Act to Define Crimes and Misdemeanors, ch. 11, § 8, p. 210 (1854) (prohibiting keeping "a house of ill fame, resorted to for the purpose of prostitution or lewdness").[27]
The offense also was recognized at common law. See, e.g., Ross v. Commonwealth, 41 Ky. (2 B. Mon.) 417 (1842) (upholding fine against individual who leased his house to another who used it as a bawdy-house); Smith v. State, 6 Gill 425 (Md.1848) (even if not a statutory offense, leasing a house for use as a bawdy-house is indictable at common law); Jennings v. Commonwealth, 34 Mass. (17 Pick.) 80 (1835) (keeping a house of ill fame is indictable both under statute and at common law); The People v. Erwin, 4 Denio 129 (N.Y.1847) (upholding indictment for leasing out a house to person who used it for prostitution).
Contemporaneous treatisesso often relied on by frontier lawyers and legislators likewise declared that the keeping of houses of prostitution was an offense at common law. See, e.g., Bishop, 1 Commentaries on the Criminal Law § 379 at 419 (noting that keeping a "bawdy-house" is an offense at common law); Russell, A Treatise on Crimes and Misdemeanors at 322 ("It is clearly agreed that keeping a bawdy-house is a common nuisance, as it endangers the public peace by drawing together dissolute and debauched persons; and also has an apparent tendency to corrupt the manners of both sexes, by such an open profession of lewdness.") (emphasis in original); Wharton, Treatise on the Criminal Law of the United States at 804 (noting that it is an indictable offense to "keep a house of ill fame for lucre").
And there was no mistake about what the legislators, courts, and commentators were talking about. A "bawdy-house" was "[a] house of lewdness and prostitution." Webster, 1 An American Dictionary (1828).[28] "Prostitution," in turn, was well understoodalbeit with more than a hint of sexismto mean "[t]he act or practice of offering the body to an indiscriminate intercourse with men; common lewdness of a female." Id.
Thus, what ORS 167.062 prohibits is precisely what states routinelyif not universallyprohibited at the time Article I, section 8, of the Oregon Constitution, was adopted. The modern statute prohibits "maintain[ing] a place of prostitution." ORS 167.012(1)(a). So also did the 1854 Oregon territorial statute and every other state either by statute or at common law.
In short, regardless of whether either ORS 167.062 or ORS 167.012 prohibit conduct or expression, neither violates the free expression guarantee of Article I, section 8, of the Oregon Constitution. Nor does ORS 167.062 violate the free expression guarantee of the First Amendment to the United States Constitution. The trial court therefore did not err in overruling defendant's demurrer to the indictment.
Affirmed.
BREWER, J., concurring in part and dissenting in part.
For reasons explained below, I dissent from the majority's conclusion that ORS 167.062 falls wholly within a historical exception to Article I, section 8, of the Oregon Constitution. ORS 167.062, as written, infringes on protected expression, in violation of Article I, section 8. Therefore, I would reverse defendant's convictions for promoting unlawful sexual conduct in a public show. However, for different reasons from those given by the majority, I agree that Article I, *468 section 8, does not shield defendant from his conviction for promoting prostitution and, accordingly, would affirm that conviction.
Defendant was charged with and convicted of promoting unlawful sexual conduct in a public show, ORS 167.062, and promoting prostitution, ORS 167.012. He argued in the trial court that both statutes are unconstitutional in that they violate his free expression rights under the state and federal constitutions. Specifically, defendant argued that ORS 167.062 is overbroad and, hence, facially invalid under Article I, section 8, and that both statutes are unconstitutional as applied to his case. The trial court rejected defendant's arguments, as does the majority here. As explained below, I would hold that ORS 167.062 is unconstitutionally overbroad under Article I, section 8, and reverse defendant's conviction under that statute.
ORS 167.062 provides, in part:
"(3) It is unlawful for any person to knowingly direct, manage, finance or present a live public show in which the participants engage in * * * sexual conduct.
"* * * * *
"(5) As used in * * * this section unless the context requires otherwise:
"(a) `Live public show' means a public show in which human beings, animals, or both appear bodily before spectators or customers.
"(b) `Public show' means any entertainment or exhibition advertised or in some other fashion held out to be accessible to the public or member of a club, whether or not an admission or other charge is levied or collected and whether or not minors are admitted or excluded."
ORS 167.060(10) defines "sexual conduct" for purposes of ORS 167.062 as follows:
"`Sexual conduct' means human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification."
No question is raised as to whether defendant presented a "live public show," or whether the performers engaged in "sexual conduct," as those terms are defined by statute. The only question is whether ORS 167.062 is unconstitutionally overbroad because the "sexual conduct" defined in ORS 167.060(10) encompasses protected expressive activity under Article I, section 8.
This court previously has addressed similar issues and applied the test enunciated in State v. Robertson, 293 Or. 402, 649 P.2d 569 (1982), to statutes and ordinances that concern so-called "adult entertainment."[1] *469 Those earlier cases demonstrate how "sexual conduct," as defined in ORS 167.060(10), is to be treated under the Robertson framework. In order to put the present case into its proper legal context, I review that prior case law in some detail.
In our initial opinion in State v. House, 66 Or.App. 953, 957, 676 P.2d 892, on recons. 68 Or.App. 360, 681 P.2d 173 (1984), aff'd. on other grounds 299 Or. 78, 698 P.2d 951 (1985), we held that ORS 167.062 was overbroad because it prohibits expression that is protected by Article I, section 8. In that case, a male stripper danced among tables while audience members touched his buttocks and genitals and placed money in his G-string. Id. at 955-56, 676 P.2d 892. We observed:
"In ballets, operas, musicals and dramas, whether tragic, comic or satirical, one performer, either in human or animal costume, may touch the buttocks, breasts or genitals of another performer. The other person touched may, as part of the performance, respond so that a reasonable person in the audience will perceive that the performer touched is sexually stimulated or gratified. To a reasonable person, the touching is `in an act of apparent sexual stimulation or gratification.' That is the message that the performers seek to convey. It is touching that the statute makes criminal. It is also expression that is protected by Article I, section 8. Live public shows that would fall under the sweep of the statute include Shakespeare's `Romeo and Juliet,' the musicals `South Pacific,' `Hair,' and `Oh! Calcutta,' the ballets `Swan Lake,' and `Leda and the Swan,' and Tennessee Williams' dramas `Sweet Bird of Youth' and `Cat on a Hot Tin Roof.'" Id. at 958, 676 P.2d 892.
On reconsideration, we narrowed our holding to the facts of the case, concluding that the portion of the statute concerning "any touching of the genitals, public area or buttocks * * * in an act of apparent sexual stimulation or gratification" was overbroad but that that portion of the statute was severable from the remaining portions concerning "human masturbation" and "sexual intercourse." House, 68 Or.App. at 365, 681 P.2d 173. On review, the Oregon Supreme Court declined to reach the constitutional question, declaring instead that the state had failed to prove an element of the crime because there was no evidence that "defendant ever engaged in an act of apparent sexual stimulation or gratification," House, 299 Or. at 82, 698 P.2d 951, and there "was no evidence that defendant was sexually stimulated or gratified by the touching of women customers * * *." Id.[2]
We have subsequently adhered to our constitutional holding in House. In City of Portland v. Gatewood, 76 Or.App. 74, 708 P.2d 615 (1985), rev. den. 300 Or. 477, 713 P.2d 1058 (1986), we distinguished an ordinance prohibiting indecent exposure from the statute at issue in House, because it was susceptible to a narrowing interpretation that would render it constitutional. We noted that "the statute under consideration in House directly and primarily burdened speech. No limiting construction was possible." Id. at 82 n. 5, 708 P.2d 615. In Sekne v. City of Portland, 81 Or.App. 630, 637, 726 P.2d 959 (1986), rev. den. 302 Or. 615, 733 P.2d 450 (1987), we cited House and Gatewood for the proposition that "[n]udity alone does not take dance out of the realm of protected expression." We concluded that the ordinance at issue in that case, which prohibited exposure of genitalia in the course of a stage or floor show, was not susceptible to a narrowing interpretation and thus was overbroad because it reached protected expression. Id. at 640, 726 P.2d 959. Finally, in State v. Maynard, 138 Or.App. 647, 910 P.2d 1115 (1996), vacated and remanded 327 Or. 582, 964 P.2d 264 (1998), adhered to on remand 168 Or.App. 118, 5 P.3d 1142 (2000), rev den 332 Or. 137, 27 P.3d 1043 (2001), we relied on House, as well as State v. Henry, 302 Or. 510, 732 P.2d 9 (1987).[3]Maynard is *470 particularly important to our analysis in the present case because the Maynard decision on remand was made in light of the Oregon Supreme Court's pronouncements on the application of the Robertson test in State v. Stoneman, 323 Or. 536, 920 P.2d 535 (1996).
In Maynard, the statute at issue concerned furnishing obscene materials to minors and incorporated the same definition of "sexual conduct" that is at issue here. ORS 167.065(1). In our first opinion, we noted that, after House, the definition of "sexual conduct" included only "human masturbation" and "sexual intercourse." 138 Or.App. at 652, 910 P.2d 1115. Nonetheless, we concluded that a content-based restriction on distributing materials to minors that depicted "sexual conduct" could not "be justified by either a historical exception or by the purpose of preventing an identified actual effect or harm." Id. at 656, 910 P.2d 1115.
The Oregon Supreme Court remanded Maynard to this court for reconsideration in light of Stoneman. The court in Stoneman held that a statute could have a purpose of preventing harmful effects even if it "did not describe the communication, the commerce in which is forbidden, specifically in terms of harmful effects." 323 Or. at 545, 920 P.2d 535. In light of Stoneman, we concluded in our second decision in Maynard that ORS 167.065(1) did, in fact, forbid harmful effects. Maynard, 168 Or.App. at 133, 5 P.3d 1142. But we continued:
"However, the statute does prohibit expression that is protected, and it may not be narrowed through judicial interpretation to remedy that defect. Therefore, we hold that ORS 167.065(1) `impermissibly restricts the right to speak, write, or print freely on any subject whatever under Article I, section 8, of the Oregon Constitution. It is unconstitutional.' Fidanque [ v. Oregon Govt. Standards and Practices ], 328 Or. [1,] 9, [969 P.2d 376 (1998) ]." Id.

These cases necessarily lead to the conclusion that "sexual conduct" as defined in ORS 167.060(10), even as limited by the court in House, may be expressive. The state does not argue otherwise on appeal. Rather, in urging us to disavow the House line of cases, the state argues that the proper question is whether the statute at issue focuses on the content of expression or whether the statute in fact focuses on conduct. The state posits that under ORS 167.060(10) "sexual conduct," i.e., "sexual intercourse" and "human masturbation" is necessarily and primarily conduct, and the fact that it may under some circumstances be expressive does not mean that a statute proscribing the conduct is facially invalid as directed at the content of expression.
The state's argument is sound, as far as it goes. There is nothing inherently or necessarily expressive about sexual intercourse or masturbation. I agree with the state's general proposition that otherwise forbidden conduct cannot bring itself within the protections of Article I, section 8, merely because the person performing the forbidden conduct is doing so as a form of expression. See generally Huffman and Wright Logging Co. v. Wade, 317 Or. 445, 452, 857 P.2d 101 (1993) (a person's reason for engaging in punishable conduct does not transform conduct into protected expression, nor does speech accompanying punishable conduct transform such conduct into protected expression). That unremarkable proposition, however, does not save the statute at issue here. The statute under which defendant was prosecuted did not attempt to prohibit "sexual conduct" in the form of sexual intercourse or masturbation generally; it prohibited the presentation of a "live public show in which the participants engage in * * * sexual conduct." ORS 167.062(3) (emphasis added). In short, the gravamen of the offense is not the "sexual conduct," which, under most circumstances, is perfectly lawful, but it is the conduct when, and only when, performed in the context of a "live public show." As noted above, a "live public show" is one in which performers appear before spectators or customers. ORS 167.062(5)(a). Moreover, a "public show" is something that provides "entertainment or exhibition." ORS 167.062(5)(b). Thus, while "sexual conduct," as defined in these statutes, is not inherently expressive or communicative, *471 "sexual conduct" that is performed before spectators or customers for entertainment or exhibition is inherently communicative.
In sum, ORS 167.062 prohibits sexual conduct only in the context of live public shows. It is irrelevant that sexual conduct is not necessarily or inherently expressive, because the statute does not prohibit sexual conduct in general. The statute seeks only to prohibit sexual conduct in the context of a "live public show," and live public shows are inherently expressive. Thus, ORS 167.062 is "written in terms directed to the substance of" a subject of communication, Robertson, 293 Or. at 417, 649 P.2d 569, and violates Article I, section 8, unless it falls wholly within a well-established historical exception to Article I, section 8.[4]
The state suggests that the House line of cases should be overturned because there is, in fact, a historical exception to the protections of Article I, section 8, for live public shows involving sexual conduct. The state points to an Oregon territorial statute, An Act to Define Crimes and Misdemeanors, and Regulate Criminal Proceedings, chapter 11, section 8 (1854), which provided:
"Every person who shall keep a house of ill fame, resorted to for the purpose of prostitution or lewdness, on conviction, shall be punished by imprisonment in the county jail not more than one year, nor less than six months, or by fine not exceeding five hundred, nor less than one hundred dollars."
The court in Henry, however, rejected a very similar argument. As noted, Henry involved the constitutionality of a statute prohibiting the dissemination of obscene materials. 302 Or. at 512, 732 P.2d 9. The state argued that a historical exception to the protections of Article I, section 8, existed as to such materials, given the existence of an 1854 statute that prohibited distribution of certain materials "containing obscene language or obscene prints, pictures, figures, or other descriptions, manifestly tending to the corruption of the morals of youth[.]" Id. at 522, 732 P.2d 9. The court rejected that argument, noting that the statute in question contained no definition of obscenity and concluding that it "certainly does not constitute any well-established historical exception to freedom of expression and * * * is in no way equivalent of statutes punishing libel, perjury, forgery and the like." Id.
A similar problem exists here. The 1854 statute in question contains a generic reference to "lewdness."[5] The term "lewdness," like the term "obscene" discussed in Henry, is not susceptible to ready definition. Lewdness has been defined as "[t]he unlawful indulgence of lust; fornication, or adultery," as well as "[l]icentiousness; shamelessness." Noah Webster, 2 An American Dictionary of the English Language (1828). According to an early law dictionary, lewdness was "[a] general term for conduct involving or expressing sexual desire in unlawful circumstances, or in ways that offend the public or tend to demoralize others." 2 Abbott's Law Dictionary, 35 (1879). If sexual conduct is lewd because it is unlawful, then a statute that makes it unlawful because it is lewd is circular and provides little guidance as to what specific conduct was intended to be prohibited.
The majority, focusing on a cluster of early public "lewdness" statutes from other jurisdictions and an Oregon territorial statute concerning the same subject, acknowledges that the term is not subject to easy definition.[6] The majority attempts to avoid the problem by saying that, despite that lack of clarity, it is easy to conclude "that [the term `lewdness'] included the sort of conduct at *472 issue in this case, that is, public sexual intercourse and masturbation." 181 Or.App. at 13, 45 P.3d at 457-458.[7] We can be sure of no such thing.
In the first place, the majority assumes that the conduct at issue here was "public" as that term was used in the many public indecency statutes to which it refers. It seems unlikely that conduct of the sort at issue heresexual conduct that occurred in a small room in an establishment that can be seen only by patrons who have paid to be thereis the type of "open" or "public" conduct that statutes prohibiting nudity and public indecency were intended to prohibit. If sexual activities between consenting adults in rooms rented to them in establishments open to the public were to be considered "lewd" and hence unlawful, then every married couple that had sexual relations while staying in a boarding house or inn would have committed a crime by doing so. That is unlikely, to say the least. Legislation prohibiting indecent exposure has nothing to do with the statute at hand, which involves expression between (and visible to) consenting adults, rather than the subjection of an unwilling audience. Thus, the "public indecency" variety of "lewdness" statute on which the majority relies does not establish a historical exception into which ORS 167.062 wholly fits.
Virtually all of the other examples that the majority cites as evidence of the existence of a historical exception also miss the point. The fact that legislatures formerly criminalized adultery and fornication, for example, tells us nothing about the proper analysis of this case. Whatever we may think of such prohibitions, no one could seriously contend that they focus on expression. Likewise, I agree with the majority that prostitution has been criminalized since time beyond memory; accordingly, no court has ever held that prostitution amounts to expression that is entitled to constitutional protection. As I explain below, the legislature lawfully may prohibit the promotion of prostitution that occurred in connection with the "two girl" shows.
Second, the majority has misconstrued the requirement that a restraint on expression be wholly contained within a historical exception. That requirement is not concerned with whether the prohibitive reach of a statute can be reduced to a rotten core of vile expression that the framers uniformly would have condemned. Rather, it is concerned with whether the "scope of the restraint," as expressed in the statute, is "wholly confined" within the exception. Plowman, 314 Or. at 163, 838 P.2d 558; Robertson, 293 Or. at 412, 649 P.2d 569. Even with respect to what remains of ORS 167.062 after House, that simply is not the case here. As we recognized in House, many stage performances both modern and from earlier erashave contained sexual scenes yet are generally recognized as being works of literary and artistic merit that would not commonly be regarded as depicting the "unlawful indulgence of lust." House, 66 Or.App. at 958, 676 P.2d 892. Under the explicit terms of ORS 167.062, some of those performances would be unlawful because the participants engaged in "masturbation" as the term is used in ORS 167.060(10). The Broadway production of "Hair" is one example. The current stage hit "Freak" may be another.[8] *473 The controversy over such performances reflects a classic collision between one segment of society's sense of acceptable expression and another's perception of obscenity. The debate over such matters is nothing new. However, it illustrates why the majority's view is untenable. True historical exceptions to the constitutional guarantee of free expressionsuch as perjury, forgery, and frauddo not trap us in a time warp of our own devising. Instead, they reflect timeless and unstinting values whose pedigree is so patent that there is no occasion to conjure their meaning or contours.[9] Contrast those examples with the majority's proposed historical exception, which apparently is so broad as to contain the depiction or presentation of any human nudity, whether in television, theater, or a movie. Such a postulate simply makes no sense in light of contemporary standards of tolerance.
I do not shrink from the majority's point thatas elaborated in Robertson the historical exception doctrine focuses on the intentions of eighteenth-and nineteenth-century constitutional framers: all the more reason to apply the doctrine with a surgeon's scalpel. Although many no doubt were admirable and, indeed, visionary people, some politicians of the era also held and practiced intolerant, narrow-minded, and bigoted beliefs.[10] If we find a spate of antiquarian American and colonial statutes and ordinances banning plays and theater altogether, have we found yet another historical exception to free expression?[11] Our adherence to historical baggage of the latter sort inevitably will lead to results that make no sense.
It is an insufficient answer to that criticism to say that we are merely following where Robertson leads us. The historical exception doctrine was devised by judges to explain what appeared to be conflicts between the protections afforded by our constitution and age-old legislative prohibitions that seemingly contradicted those protections. There is nothing in Robertson that requires us to enshrine, as an exception to Article I, section 8, every type of statute regulating expression that commonly was on the books in the eighteenth and nineteenth centuries. Rather than extend the doctrine beyond the explicitly defined sorts of immutable crimes listed in Robertson, the courts would do well to examine the constitutionality of other legislation burdening expression against a more logical standard, namely, whether the legislation permissibly has targeted the harmful effects of such expression.[12] That approach may *474 have been foreshadowed in Stoneman, where the Supreme Court declined to apply the historical exception doctrine to uphold a statute prohibiting commerce in child pornography but, instead, concluded that the legislature's evident and permissible purpose in enacting the statute was to prevent the sexual exploitation of children. 323 Or. at 545-47, 920 P.2d 535. Significantly, the state makes no harmful effects argument in support of ORS 167.062. We should accept that concession and be done with it.
Third, the majority's analysis, while erudite and extensive, is notably lacking in its failure to come to terms with what the Supreme Court held in Henry. Henry concerned the dissemination of books and videos portraying "sexual conduct." 302 Or. at 512, 732 P.2d 9. Following Robertson, the court framed the question as "whether `obscene' expressions fall within such historical exceptions as `perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants.'" Henry, 302 Or. at 515, 732 P.2d 9 (quoting Robertson, 293 Or. at 412, 649 P.2d 569). The court undertook an extensive review of "crimes against public decency." Henry, 302 Or. at 516-18, 732 P.2d 9. The court concluded that "from our review of the English and American cases and statutes, we conclude that restrictions on sexually explicit or obscene expressions were not well established at the time the early freedoms of expression were adopted." Id. at 520, 732 P.2d 9 (emphasis added).
When all is said and done, the majority here simply ignores that holding and follows its own version of history in concluding that there was, in fact, a well-established historical exception to Article I, section 8, for "sexually explicit or obscene expressions." The majority sweeps away not only our own precedent in House, but also ignores the Supreme Court's holding in Henry, in order to reach its desired result. The Supreme Court's ultimate conclusion bears repeating here:
"We conclude as we did in reviewing English and American history that restrictions on sexually explicit and obscene expression between adults were not well established at the time of the adoption of Article I, section 8, of the Oregon Constitution.
"* * * * *
"* * * In this state any person can write, print, read, say, show or sell anything to a consenting adult even though that expression may be generally or universally considered `obscene.'" Henry, 302 Or. at 523, 525, 732 P.2d 9 (emphasis added).
That holding has consistently been affirmed by the Supreme Court, see, e.g., Stoneman, 323 Or. at 541 n. 6, 920 P.2d 535; City of Portland v. Tidyman, 306 Or. 174, 179, 759 P.2d 242 (1988), and this court is not free to disregard or distinguish it by unearthing a different, but equally obscure, territorial statute upon which to spin a different view of history. It is beyond this court's authority to refuse to follow precedent of the Oregon Supreme Court on the ground that we disagree with it.
Finally, the majority's linkage of "lewdness" to public nudity is also incongruous in that it suggests that many forms of expression protected under the First Amendment are not protected by Article I, section 8. If, as the majority appears to suggest, legislation proscribing "public nudity" constitutes a historical exception to constitutional guarantees of free expression, the United States Supreme Court has yet to grasp that fact. The Court repeatedly has held that customary, barroom-type nude dancing is expressive conduct that is entitled to some measure of protection under the First Amendment. City of Erie v. Pap's A.M., 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); Barnes v. Glen Theatre, Inc., 501 U.S. 560, 563, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). In fact, under the First Amendment, a government may not prohibit sexually explicit dance movements as a means of regulating sexually oriented businesses. Schultz v. City of Cumberland, 228 F.3d 831, 847 (7th Cir. 2000). It seems highly unlikely, to say the least, that the Oregon Supreme Court in Henry, or in any of its subsequent decisions, meant to say that Article I, section 8, provided more meager protection for expression.
*475 The burden of demonstrating that a restriction on expression falls wholly within a historical exception is a heavy one. Moser v. Frohnmayer, 315 Or. 372, 376, 845 P.2d 1284 (1993). Neither the state nor the majority has met it here. Because ORS 167.062 is directed at the content of expression and it prohibits constitutionally protected expression, it is overbroad. Further, because we may not excise the unconstitutional prohibitions and leave an intact criminal offense, the statute may not be narrowed through judicial interpretation to remedy that defect. Accordingly, it violates Article I, section 8, of the Oregon Constitution.
I turn to defendant's argument that ORS 167.012, prohibiting the promotion of prostitution, is unconstitutional as applied to the present case. ORS 167.012(1) provides, in part:
"A person commits the crime of promoting prostitution if, with intent to promote prostitution, the person knowingly:
"(a) Owns, controls, manages, supervises or otherwise maintains a place of prostitution or a prostitution enterprise[.]"
ORS 167.007(1) provides:
"A person commits the crime of prostitution if:
"(a) The person engages in or offers or agrees to engage in sexual conduct or sexual contact in return for a fee; or
"(b) The person pays or offers or agrees to pay a fee to engage in sexual conduct or sexual contact."[13]
In support of his contention that ORS 167.012(1) is unconstitutional as applied to him, defendant argues:
"The same conduct that resulted in defendant's convictions under ORS 167.062 also resulted in his conviction under ORS 167.012. Therefore, even if the described conduct meets the technical definition of prostitution, defendant is still entitled to judgment of acquittal because the dancers were engaged in protected expression."
Defendant's argument fails. The conclusion that ORS 167.062, relating to "live public shows," is facially overbroad does not in any way imply that every type of conduct performed in the course of such a show is somehow protected under Article I, section 8, of the Oregon Constitution.
Viewed in the light most favorable to the state, the evidence in the record supports findings that the performers in the "two girl show" committed acts of prostitution, as defined in ORS 167.002 and that defendant promoted that conduct: that is, conduct that is illegal with no expressive aspects. As noted above, engaging in otherwise punishable conduct for expressive reasons, or engaging in otherwise punishable conduct and protected expression at the same time, does not somehow transform the punishable conduct into protected expression. Huffman and Wright Logging, 317 Or. at 452, 857 P.2d 101. In that case, Earth First! protestors trespassed on property in the course of a demonstration against logging practices. Id. at 447, 857 P.2d 101. The reason for the trespass concerned political expression, and, in fact, in the course of the trespass the protestors hung a banner that expressed a political message. Id. The court held, however, that "[t]he message that defendants sought to convey by their conduct, the reason for their conduct, and the spoken and written words accompanying their conduct did not transform defendants' conduct into speech." Id. at 458, 857 P.2d 101. In short, the elements of a trespass remained the same, regardless of any accompanying expressive speech or political motive.
Similarly, the elements of promoting prostitution were met here, whether the conduct constituting the prostitution promoted by defendant involved two persons engaged in sexual conduct in a dark alley or in a motel room, or two persons engaged in the same conduct in front of customersin effect, an audiencein a private room of a "gentlemen's club." Stated another way, the statute does not seek to punish the promotion of *476 prostitution only when the prostitution occurs in front of an audience or because it occurs in front of an audience. Rather, it seeks to punish all acts of promoting prostitution regardless of the ostensible reason for the prostitution or for the promotion of it, whether that reason is monetary gain, sexual gratification, or artistic expression.[14] As discussed above, under Article I, section 8, a person's expressive purpose for engaging in otherwise punishable conduct does not transform that conduct into protected expression. Huffman and Wright Logging, 317 Or. at 454, 857 P.2d 101.[15] The trial court correctly concluded that ORS 167.012, providing for the crime of promoting prostitution, was not unconstitutional as applied to defendant.
I respectfully concur in part and dissent in part.
WOLLHEIM, J., joins in this opinion.
ARMSTRONG, J., dissenting.
The majority concludes that ORS 167.062, which prohibits sexual conduct in a live public show, does not violate Article I, section 8, of the Oregon Constitution, the Oregon constitutional guarantee of free expression. It reaches that conclusion on the ground that ORS 167.062 fits within a restriction on expression that was well established by 1859 when the state adopted Article I, section 8, and that was demonstrably intended to survive the adoption of the free speech guarantee. The majority is wrong. The historical record on which it relies to conclude that ORS 167.062 comes within a historical exception is equivalent to the record that the Supreme Court held in State v. Henry, 302 Or. 510, 732 P.2d 9 (1987), and that we held in State v. Maynard, 168 Or.App. 118, 5 P.3d 1142 (2000), rev. den. 332 Or. 137, 27 P.3d 1043 (2001), was insufficient to establish an exception under Article I, section 8, for laws against the distribution of sexually explicit materials to adults and to minors. Consequently, the majority's decision in this case cannot be reconciled with the decisions in Henry and Maynard.
Furthermore, the majority misunderstands and, hence, misapplies the exception under Article I, section 8, for laws that were well established and demonstrably intended to survive the adoption of the free speech guarantee. The test for the exception is a two-part test. It requires the state (1) to establish that the restriction on expression on which it relies was well established by 1859 and (2) to demonstrate that the restriction was intended to survive the adoption of the constitutional guarantee against the enactment of laws that restrict expression. See, *477 e.g., State v. Robertson, 293 Or. 402, 412, 649 P.2d 569 (1982). The majority stands the second part of the test on its head. Rather than requiring the state to demonstrate that the restriction was intended to survive the adoption of the guarantee, the majority looks to the historical record to see if it demonstrates that the guarantee was intended to displace the restriction. 181 Or.App. at 17-19, 45 P.3d at 459-460. As I will explain in greater detail, that is not the way that the exception works.
Both the majority and Judge Brewer conclude that the conviction of defendant for violating ORS 167.012, which prohibits the promotion of prostitution, does not run afoul of Article I, section 8. I respectfully disagree. Although people generally can be held liable for criminal acts committed while engaged in expressive activity, some criminal laws cannot constitutionally be applied to people engaged in expressive activity. In the context of this case, ORS 167.012 is such a law.
Article I, section 8, provides that
"[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."
The state contends that the law that prohibits sexual conduct in a live public show, ORS 167.062, is a law that restricts conduct and not expression and, hence, is a law that is valid under Article I, section 8. The majority does not resolve that issue. It suggests, however, that the state could be correct. 181 Or.App. at 7, 45 P.3d at 453-454. The majority's discussion of this issue betrays how thoroughly it misunderstands the relevant analysis.
The threshold issue under Article I, section 8, is whether the challenged law restricts expression. The issue is not whether the particular expression is protected by Article I, section 8, against restriction. See, e.g., Robertson, 293 Or. at 412, 436-37, 649 P.2d 569. The majority confuses those two issues. It says:
"As Huffman and Wright Logging Co. [v. Wade, 317 Or. 445, 857 P.2d 101 (1993),] makes clear, merely engaging in conduct to attract the attention of an audience does not necessarily transform the conduct into protected expression. Homicide, for example, is conduct. Performing it in front of an audience does not transform it into protected expression."
181 Or.App. at 7, 45 P.3d at 454.
Article I, section 8, generally does not immunize from criminal liability the conduct of people who engage in expressive activity if the liability is imposed under criminal laws that apply irrespective of whether the proscribed conduct serves an expressive purpose. That is why the trespass in Huffman and Wright Logging Co. could be punished even though those who trespassed did so to communicate ideas, and that is why a law against murder would apply to a theatrical production.
However, if there were no law against murder except a law that prohibited murder in a live public show, then the law restricting murder in a live public show would be a law that restricted expression. That is because imposition of the restriction would depend on whether the conduct served an expressive purpose, which means that the focus of the law would be on restricting expression rather than on preventing murder, because murder would otherwise be lawful. Of course, the law might be valid under Article I, section 8, if it met the criteria that laws restricting expression must meet in order to be valid under that provision, but it still would be analyzed as a law that restricts expression. Judge Brewer makes precisely that point in his dissent, 181 Or.App. at 36-37, 45 P.3d at 470-471 (Brewer, J., concurring in part, dissenting in part), and he is right. ORS 167.062 prohibits sexual conduct in a live public show. Leaving aside the issue of payment of the performers, the sexual conduct that the statute prohibits is conduct that is otherwise lawful among consenting adults. That means that the statute operates to restrict the conduct only if the conduct serves an expressive purpose. Consequently, the statute restricts expression.
Because ORS 167.062 is a law that restricts expression, its validity must be evaluated *478 under the standards that apply to such laws. ORS 167.062 is not a law that focuses on the effects of the prohibited expression, because the state need not establish that the expression had any effect, harmful or otherwise, in order to convict people under the statute. Consequently, the validity of the statute depends on whether it comes within a restriction on expression that was well established when the state adopted Article I, section 8, and that was demonstrably intended to survive the adoption of that provision. See, e.g., Robertson, 293 Or. at 412, 649 P.2d 569.
The majority concludes that ORS 167.062 is such a law. It marshals as support for that conclusion a body of law that restricted nudity and sexual conduct both before and after the adoption of Article I, section 8. For a number of reasons, that body of law does not establish that ORS 167.062 comes within a historical exception to the protection afforded free expression by Article I, section 8.
The most obvious reason that it does not is that the body of law on which the majority relies is indistinguishable from the body of law that the Supreme Court in Henry and we in Maynard rejected as establishing a historical exception for laws that prohibit the distribution of sexually explicit materials to adults and minors. The majority traces the restrictions on which it relies to a 1663 English case involving Sir Charles Sedley, Sir Charles Sydlyes Case, 83 Eng. Rep. 1146 (KB 1663). 181 Or.App. at 9-10, 45 P.3d at 455. That is the same case that is commonly identified as the source of the common-law restrictions on obscene expression. See, e.g., Maynard, 168 Or.App. at 164, 178-79, 5 P.3d 1142 (Landau, J., dissenting). Although there are differences in the details of the various laws that allegedly comprise the historical exception at issue in Henry, Maynard, and this case, those differences are legally insignificant. To the extent that the relevant restrictions targeted expression, their purpose was to restrict objectionable sexual expression in order to discourage or prevent objectionable sexual conduct. In other words, the restrictions sought to impose "a uniform vision on how human sexuality should be regarded or portrayed." Henry, 302 Or. at 525, 732 P.2d 9. The Supreme Court held in Henry that the body of law that sought to impose that vision did not constitute a historical exception under Article I, section 8. Until the Supreme Court overrules Henry and we overrule Maynard, we cannot hold, as the majority does, that ORS 167.062 comes within a well-established restriction on expression that was intended to survive the adoption of Article I, section 8.
The majority's historical analysis is flawed for other reasons as well. It lumps together laws on conduct with laws on expression, see 181 Or.App. at 9-15, 45 P.3d at 455-458, and laws that sought to protect unwilling viewers and children against exposure to sexually explicit expression with laws that sought to prevent everyone from being exposed to that expression, see id. Again, the analysis does not work that way. The laws that matter for purposes of historical exceptions under Article I, section 8, are laws whose purpose is to restrict expression. A law against murder will prevent theatrical productions that feature actual murders, but it is not a law that specifically restricts expression. Consequently, the laws cited by the majority that involved restrictions on sexual conduct irrespective of whether the conduct was presented for expressive purposes are irrelevant to whether there is a historical exception that applies to the prohibition at issue here, which is the prohibition in ORS 167.062 against the presentation of sexual conduct in a live public show.
Similarly, it is necessary to distinguish, as the court did in Henry, between laws that sought to protect unwilling viewers against sexual, excretory, or similarly offensive expression and laws that sought to protect everyone against it. See Henry, 302 Or. at 525, 732 P.2d 9. When the focus is narrowed, as it must be, to laws that sought to prevent people from presenting sexually explicit performances to a willing audience, it should be evident, again, that the laws at issue are indistinguishable from the laws at issue in Henry and Maynard that sought to restrict sexually explicit expression in order to promote a uniform vision of acceptable sexual behavior. Those laws do not establish that ORS 167.062 comes within a historical *479 exception to the protection afforded free expression by Article I, section 8.
The majority's approach also fails to recognize that there is a distinction under Article I, section 8, between conventional laws that restrict expression and other laws that do so. The analysis that the court established in Robertson takes the text of Article I, section 8, at face value and recognizes that the provision imposes a broad prohibition against the enactment of laws that restrain or restrict expression. The court recognized, however, that that prohibition could not be applied literally, because it would mean that there could be no law in Oregon that restricted expression, and the court did not believe that Article I, section 8, was intended to have that effect.
The court resolved the apparent conflict between the text of Article I, section 8, and the principle that some restrictions on expression are permitted by recognizing the familiar three-category distinction among restrictions on expression: (1) those that come within a well-established restriction on expression that was demonstrably intended to survive the adoption of Article I, section 8; (2) those that focus on the harmful effects of expression; and (3) those that are not directed at expression but that are subject to challenge under Article I, section 8, when they are applied to restrict expression. See Robertson, 293 Or. at 412, 417 & n. 11, 649 P.2d 569.
What the majority fails to appreciate is that the first category of laws, those that come within a well-established historical exception, is subject to a further division between conventional laws that restrict expression and other laws that do so. In summarizing its decision in Robertson on the constitutionality of the coercion statute, ORS 163.275 (1981), the court explained:
"To recapitulate, we believe that the constitutional right to speak, write, or print freely on any subject whatever guaranteed in article I, section 8, was not meant to immunize the use of words in some respects relevant to ORS 163.275 [(1981) ]. As we have said, one of these is the use of words in the course of what indisputably would have been a conventional crime when Oregon's Bill of Rights was adopted in 1859, or in the course of similar kinds of conventional crimes that lawmakers from time to time enact.28
"28 We refer to `conventional' crimes so as not to imply that constitutional freedom of expression today does not extend to crimes known before the Bill of Rights, such as seditious or criminal libel, that restrained freedom of public disclosure and debate."
Robertson, 293 Or. at 433 & n. 28, 649 P.2d 569. As that statement indicates, restrictions on expression embodied in historically established conventional crimes survived the adoption of Article I, section 8. However, restrictions imposed by historically established laws whose purpose was to restrict thoughts and ideas did not necessarily survive the adoption of the provision. The state must demonstrate that they were intended to survive the adoption.[1]
As Robertson and other cases make clear, conventional crimes are those that restrict expression to prevent identifiable, tangible harm, such as laws against perjury, fraud, forgery, solicitation or verbal assistance in crime, etc. See, e.g., Robertson, 293 Or. at 412, 649 P.2d 569. Crimes such as seditious libel and criminal libel that restrict expression to control thoughts and ideas are not. Id. at 433 & n. 28, 649 P.2d 569. The statute at issue here, ORS 167.062, which restricts the sexual content of shows presented to an audience of willing adult viewers, is the latter type of law.
*480 Henry establishes, in turn, that laws equivalent to ORS 167.062 that were adopted contemporaneously with Article I, section 8, are insufficient to show that those laws were intended to survive the adoption of Article I, section 8. The Oregon territorial legislature adopted restrictions on obscene expression in 1853 and 1855 and the Oregon legislature did so just after statehood, see General Laws of Oregon 1845-1864, Crim. Code, ch. 48, § 637, p. 560 (Deady ed. 1866), yet the Henry court held that the existence of those laws failed to establish that they survived the adoption of the free speech guarantee:
"As we cautioned in State ex rel Oregonian Pub. Co. v. Deiz, 289 Or. 277, 284, 613 P.2d 23 (1980), `[c]ontemporaneous legislative actions should not necessarily be given much weight when construing constitutional principles. Constitutional draftsmen are concerned with broad principles of long-range significance.'"
302 Or. at 521-22, 732 P.2d 9.[2]
Here, the relevant historical record establishes, at most, that the state imposed restrictions on the sexual content of live expressive works contemporaneously with the adoption of Article I, section 8. As in Henry, that is insufficient to show that restrictions of that kind were intended to survive the adoption of the constitutional guarantee. The majority errs in concluding otherwise.
I turn to defendant's challenge to his conviction for promoting prostitution in violation of ORS 167.012. As I noted earlier, people who engage in expressive conduct generally are not immune from liability for violating laws that apply to the conduct irrespective of whether the conduct serves an expressive purpose. Consequently, a person who commits murder in a theatrical performance is liable for that crime even though the murder was committed solely for expressive purposes. The majority and Judge Brewer apply that principle to conclude that Article I, section 8, does not immunize defendant from liability for promoting prostitution by paying performers to engage in sexual conduct in a live public show, because the law against promoting prostitution is one that applies irrespective of whether the violation served an expressive purpose.
The California Supreme Court confronted the same issue under the First Amendment in People v. Freeman, 46 Cal.3d 419, 758 P.2d 1128, 250 Cal.Rptr. 598 (1988), and concluded that California's prostitution laws could not be applied to penalize a film producer for paying actors to perform in a sexually explicit film. Although the court recognized that expressive conduct generally is subject to laws that apply irrespective of whether the conduct serves an expressive purpose, such as laws against murder, rape, and robbery, see 46 Cal.3d at 428-29, 250 Cal.Rptr. 598, 758 P.2d 1128, it held that the prostitution laws were qualitatively different from other laws when applied to expressive work. It noted, for example, that applying such laws to film production would mean that people who produced
"films of unquestioned artistic and social merit, as well as films made for medical or educational purposes,"
would be subject to prosecution for promoting prostitution. Id. at 426, 250 Cal.Rptr. 598, 758 P.2d 1128. The court rejected that conclusion under the First Amendment.[3]
I would do so as well under Article I, section 8, of the Oregon Constitution. If it is lawful to film or produce a live public show in Oregon in which willing adult viewers watch unpaid adult performers engage in a performance that includes sexual conduct, and I believe that Article I, section 8, establishes that it is, then the state cannot apply the *481 prostitution laws to make that conduct unlawful when the performers are paid for their performance. I therefore would reverse defendant's conviction for promoting prostitution in violation of ORS 167.012.[4]
I respectfully dissent.
NOTES
[1] Judge Brewer questions whether the performance amounted to "intercourse," as opposed to masturbation. 181 Or.App. at 39 n. 7, 45 P.3d at 472 n. 7 (Brewer, J., concurring in part and dissenting in part). We likewise are not certain that the conduct at issue is "intercourse" within the meaning of the statute. But defendant argues that the conduct at issue implicates both components of the statutory prohibition against public shows of "sexual conduct," and the state does not take issue with that. Moreover, our analysis in no way depends on whether the conduct at issue amounted to "intercourse," as opposed to "masturbation."
[2] The Supreme Court did not explain in Robertson what it meant by a "well-established" historical exception. Cf. William R. Long, Requiem for Robertson: The Life and Death of a Free Speech Framework in Oregon, 34 Will. L. Rev. 101, 135 (1998) (a "well-established" historical exception "means whatever the court perceives it to mean" in each case). It could mean that the exception had existed for many years before the adoption of the constitution. It could mean that the exception was widely acknowledged by that time. It could mean both. In this case, as we explain in some detail below, the relevant historical exceptions existed for centuries and were well-nigh universal at the time that the Oregon Constitution was adopted, so we need not decide precisely what the Robertson test requires; whatever it requires, the historical evidence is sufficient in this case.
[3] In referring to the "relevant historical period," we refer generally to the time of adoption of the Oregon Constitution. Given that the focus of the historical exception analysis is what the framers of the Oregon Constitution would have understood, that seems to make sense. See State v. Henry, 302 Or. 510, 521, 732 P.2d 9 (1987) (objective of Article I, section 8, analysis is to determine whether the guarantees of freedom of expression "were not intended to replace" earlier restrictions on expression); Robertson, 293 Or. at 412, 649 P.2d 569 (characterizing the objective as determining whether Article I, section 8, was "intended" to reach previously well-established forms of state regulation). There is language in Robertson that also refers to the state of the historical record as of the adoption of "the first American guarantees of freedom of expression" in the late eighteenth century. 293 Or. at 412, 649 P.2d 569. Why the state of the law 60 years before the adoption of the Oregon Constitution would control is not entirely clear. In this case, however, it makes no difference, because there is no substantial difference between those time periods as to the existence of a historical exception.
[4] Thus, if the challenged statute is wholly contained within a well-established historical exception, it is not necessary to address whether the statute is overbroad. A statute is overbroad only to the extent that it regulates expression protected under Article I, section 8. See State v. Rangel, 328 Or. 294, 299, 977 P.2d 379 (1999) ("An overbroad statute is one that proscribes speech or conduct that the constitution protects."). If the statute is wholly contained within a well-established exception to Article I, section 8, logically, it cannot be overbroad.
[5] Regulation of private sexual conduct by the ecclesiastical courts dates back even further. Records from 1475 to 1640 show that English ecclesiastical courts "exercised a wide disciplinary control over the moral life of the members of the church," trying parishioners for such offenses as adultery, incontinency, and incest. William Holdsworth, 1 A History of English Law, 619 (7th ed. 1956).
[6] Sydlye, by the way, is of much more than colorful, academic significance, for it proved to be a very well-known decision in America that was much-cited by nineteenth-century treatise writers and courts as support for the conclusion that public nakedness was actionable at common law. E.g., William Oldnall Russell, A Treatise on Crimes and Misdemeanors, 325 n. b (1845) (citing Sydlye); Francis Wharton, A Treatise on the Criminal Law of the United States, 804 (3rd ed. 1855) (citing Sydlye).
[7] As the Oregon Supreme Court explained in Smothers v. Gresham Transfer, Inc., 332 Or. 83, 98, 23 P.3d 333 (2001), Blackstone's Commentaries were sold widely in America "and became one of the principal means of the colonists' information about the state of English law in general." See also Daniel J. Boorstin, The Mysterious Science of the Law: An Essay on Blackstone's Commentaries, 3, 4 (1996) ("In the first century of American independence, the Commentaries were not merely an approach to the study of law; for most lawyers they constituted all there was of the law. * * * In view of the scarcity of lawbooks during the earliest years of the Republic, and the limitations of life on the frontier, it is not surprising that Blackstone's convenient work became the bible of American lawyers.").
[8] Massachusetts colonists, for example, decried the "leniency" of the English ecclesiastical courts in dealing with moral offenses and transferred the entire jurisdiction of the ecclesiastical courts to the civil justice system so that sexual conduct could be regulated by the colony more in keeping with biblical principles. See George Lee Haskins, Law and Authority in Early Massachusetts: A Study in Tradition and Design, 90, 183 (1968).

This obsession with the regulation of sexual conduct was not limited to Massachusetts puritans, but is reflected in the laws of other colonies, such as Virginia, New York, Pennsylvania, and Maryland, as well. See generally David H. Flaherty, Law and the Enforcement of Morals in Early America, in Law in American History, 203, 213-14 (Donald Fleming & Bernard Bailyn eds. 1971); Traci Shallbetter Stratton, No More Messing Around: Substantive Due Process Challenges to State Laws Prohibiting Fornication, 73 Wash. L. Rev. 767, 769 (1998). The colonies forbade fornication of any sort and punished the offense by fine, lashes on the back, andinterestingly marriage. Id.; see also John D'Emilio & Estelle B. Freedman, Intimate Matters: A History of Sexuality in America, 22 (1988) (describing different colonial punishments for fornication).
[9] The Oregon courts also recognized that, at common law, open and notorious lewdness, including "roaming the streets naked [and] the indecent exposure of the person on a highway or in a public place," were well-recognized as punishable "because they outraged public decency and were against good morals." State v. Nease, 46 Or. 433, 440, 80 P. 897 (1905) (citations omitted).

Judge Brewer takes us to task for citing statutes and cases that were published after the adoption of the Oregon Constitution. Without citation to authority, he contends that such historical sources "shed no significant light on the framers' intent." 181 Or.App. at 39 n. 6, 45 P.3d at 471 n. 6 (Brewer, J., concurring in part and dissenting in part). Judge Armstrong similarly complains that our reliance on such materials is improper. With respect, both are mistaken, as a matter of logic and precedent.
Logically, later-enacted statutes can serve as significant sources of information about the state of the law in earlier times, particularly when the statutes were intended merely to codify earlier common-law doctrines, as is often the case. See, e.g., State v. Jackson, 224 Or. 337, 343, 356 P.2d 495 (1960) (observing that statute "does no more than codify what has long been the common law rule of construction in this state").
As for precedent, the Oregon Supreme Court frequently has resorted to later-enacted statutes to determine the meaning of the constitution. For example, in Jory v. Martin, 153 Or. 278, 293-95, 56 P.2d 1093 (1936), the court determined the meaning of the constitution by reference to, among other things, legislative enactments during the 1860, 1862, 1893, 1895, and 1905 legislative sessions. More recently, in Smothers, the court determined the intended meaning of Article I, section 10, in part by relying on the views of Matthew Deadywho, the court noted, served as the president of the Oregon Constitutional Convention in 1857expressed some 30 years after the adoption of the constitution. 332 Or. at 122, 23 P.3d 333. The court also relied on case law from this and other jurisdictions from 1879-88 to determine the state of Oregon tort law two to three decades earlier, that is, at the time of the adoption of the state constitution. Id. at 129-31, 23 P.3d 333.
[10] The 1828 edition did not have numbered pages.
[11] Interestingly, in response to judicial concerns about the vagueness of the term "lewdness," the Indiana Legislature later amended the statute to make clear that it prohibited any person from "mak[ing] any uncovered and indecent exposure of his or their person," once again illustrating the well-understood connection between "lewdness" and public sexual conduct. Williams v. The State, 64 Ind. 553, 555 (1878).
[12] Flaherty similarly details colonial exasperation with the enforcement of laws concerning public morality, leading to extra-legal efforts to enforce community standards of morality. Flaherty, Law and the Enforcement of Morals in Early America at 225-45. Others have observed that, although colonial prohibitions against illicit sex were harsh in tone, judicial enforcement of them often was restrained in practice. See, e.g., Richard Godbeer, Sexual Revolution in Early America, 101-02 (2002).
[13] There was one challenge to the constitutionality of a federal obscenity statutethe infamous Comstock Act of 1873, 18 USC § 1461before the United States Supreme Court shortly after the Civil War. The Court held:

"The only question for our determination relates to the constitutionality of the act; and of that we have no doubt."
Ex Parte Jackson, 96 U.S. 727, 737, 24 L.Ed. 877 (1877).
[14] As late as 1897, the United States Supreme Court held that the First Amendmentindeed, the entire Bill of Rightswas

"not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case. In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed. Thus, the freedom of speech and of the press (art. 1) does not permit the publication of libels, blasphemous or indecent articles, or other publications injurious to public morals or private reputation[.]"
Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897). Even a decade later, Justice Holmes, writing for the Court, explained that the guarantees of freedom of expression contained in the First Amendment were intended to prohibit only prior restraints and that after-the-fact state regulation of speech was constitutional so long as the speech tended to injure public morals. Patterson v. Colorado, 205 U.S. 454, 462-63, 27 S.Ct. 556, 51 L.Ed. 879 (1907).
[15] Moreover, as White has noted, the emergence of such radical thought in the late-nineteenth century cannot be seen as fully reflective of what lawmakers generally thought about the authority of the state at the time. White, The First Amendment Comes of Age, 95 Mich. L. Rev. at 311 n 25.
[16] Judge Brewer similarly complains that some of the cases and statutes that we have cited such as those pertaining to adultery and fornicationconcern nonexpressive conduct and thus are entirely irrelevant. 181 Or.App. at 40, 45 P.3d at 472 (Brewer, J., concurring in part and dissenting in part). Once again, however, he has missed the point: In the mid-nineteenth century, state legislatures pervasively regulated sexual conduct, both public and private, expressive and nonexpressive. Given that historical fact, we can only conclude that the conduct at issue in this case was not regarded by the framers as constitutionally protected.
[17] Moreover, Judge Brewer's factual premise that nineteenth-century sexual conduct statutes no longer reflect public morality, 181 Or.App. at 41, 45 P.3d at 473 (Brewer, J., concurring in part and dissenting in part, slip op at 13)is at least debatable. As recently as 1990, 47 states continued to prohibit indecent exposure. See Barnes v. Glen Theatre, Inc., 501 U.S. 560, 568, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (reporting current indecent exposure regulation).
[18] Judge Brewer also notes in passing that, based on a 1993 decision of the Canadian Supreme Court, our neighbors to the north would be "perplexed" by our "sense of historical obligation." 181 Or.App. at 41 n. 9, 45 P.3d at 473 n. 9 (Brewer, J., concurring in part and dissenting in part). Perhaps so. But then, the Canadian courts are not bound to follow Robertson. We are.
[19] In Sekne v. City of Portland, 81 Or.App. 630, 726 P.2d 959 (1986), rev. den. 302 Or. 615, 733 P.2d 450 (1987), this court similarly held that a local ordinance proscribing all nude dancing in taverns was unconstitutionally overbroad. The opinion relegated Robertson to a footnote; indeed, it expressly declined to determine whether the challenged ordinance was wholly contained within a well-established historical exception because the parties did not brief the matter. Id. at 636 n. 2, 726 P.2d 959.
[20] That is not the only oddity that House reflects. On the one hand, this court struck down the prohibition against public touching of the genitals in an act of apparent sexual gratification while, on the other hand, it severedthat is, it left intactanother provision prohibiting public masturbation. It is unclear to us whether there can be a meaningful distinction between public touching of the genitals and public masturbation, given that, by definition, "masturbation" involves touching the sexual organs in an act of sexual stimulation. See Webster's Third New Int'l Dictionary, 1391 (unabridged ed 1993).
[21] In a related vein, Judge Brewer insists that we "spin a different view of history" than is reflected in several selected passages in Henry. 181 Or.App. at 44, 45 P.3d at 474 (Brewer, J., concurring in part and dissenting in part). It is true that the court indulged in some general historical observations about the framers being "rugged and robust individuals" who were uninterested in the regulation of public morality. Henry, 302 Or. at 523, 732 P.2d 9. It is also true that such general observations about the framers are tough to square with the historical evidence. We certainly are not the first to make that point. See, e.g., Daniel Barnhart, Comment, The Oregon Bill of Rights and Obscenity: How Jurisprudence Confounded Constitutional History, 70 Or. L. Rev. 907, 923 (1991) (noting that the Supreme Court in Henry ignored over six decades of statutes and case law illustrating state regulation of obscenity).

That raises an interesting question: When the Supreme Court makes such general comments about American legal history, are lower courts bound by them, even when they are demonstrably incorrect? If, for example, the Supreme Court decides that John Wilkes Booth did not assassinate Abraham Lincoln, are we bound by that "decision" in future cases?
Fortunately, we do not need to answer that question. We are confident that, to the extent that the court's comments about history are not necessary to the holding of a decision, we are not bound by them. That is so in this case. None of the court's comments in Henry about rugged and robust pioneer forebears and the like were indispensable to the holding of that decision.
[22] Judge Brewer also claims support from a recent decision of the Court of Appeals for the Seventh Circuit, Schultz v. City of Cumberland, 228 F.3d 831 (7th Cir.2000). While the citation to the case is accurate enough, the case itself hardly reflects an uncontested majority view. See, e.g., Farkas v. Miller, 151 F.3d 900, 904 (8th Cir.1998) (upholding constitutionality of state statute prohibiting, among other things, "simulated public performance of any sex act upon or in [a] place of business"); Dodger's Bar & Grill v. Johnson Cty. Bd. of Com'rs, 32 F.3d 1436 (10th Cir.1994) (upholding constitutionality of county resolution barring public show of actual or simulated sexual intercourse, masturbation, and assorted other sexual acts); see also Richland Bookmart v. Nichols, 278 F.3d 570 (6th Cir.2002) (upholding constitutionality of nude dancing regulation); Deja Vu of Nash. v. Metro. Gov't of Nash., 274 F.3d 377 (6th Cir.2001) (upholding regulation of nude dancing); Hang On, Inc. v. City of Arlington, 65 F.3d 1248 (5th Cir.1995) (upholding constitutionality of ordinance regulating nude dancing).
[23] The law, in fact, is to the contrary. In Smith v. Employment Div., 301 Or. 209, 721 P.2d 445 (1986), for example, the Oregon Supreme Court determined that the state free exercise clause is less protective than its federal constitutional counterpart. The United States Supreme Court ultimately disagreed with the Oregon court's reading of the First Amendment. Employment Div., Ore. Dept. of Human Res. v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). But the fact remains that, as a matter of state constitutional law, the Oregon Supreme Court has determined that it does not necessarily follow that, merely because the Oregon Constitution sometimeseven oftenis more protective of individual rights, it must always be so.
[24] In a similar vein, Judge Armstrong contends that we have misstated the proper focus of the inquiry, which he insists should be whether there is evidence that the framers specifically intended the particular type of regulation at issue to survive the adoption of Article I, section 8. 181 Or.App. at 49, 45 P.3d at 477 (Armstrong, J., dissenting). In our view, the phrasing of the testwhether in the negative or the affirmative does not matter in this case. In either event the question is what the framers would have understood, and that, we believe, is clear from the historical evidence.
[25] Rudyard Kipling, In Black and White, 121 (1888).
[26] The Liber Albus, a collection of, among other things, London municipal ordinances and "articles" compiled in 1419, reports that Edward I proclaimed that "no courtesan [or] common brothel-keeper shall be residing within the walls of the City, under pain of imprisonment." Liber Albus: The White Book of the City of London, 239 (Henry Thomas Riley ed., 1861). Edward II, similarly proclaimed that "no woman of lewd life, bawd, courtesan, or common scold, be resident in the Ward." Id. at 287. During the reign of Richard II, a woman found to be a common courtesan was required to dress in striped cloth, carry a white wand in her hand, and be taken to a pillory accompanied by minstrels where her crime was to be proclaimed to the people, after which time she was to be marched off to jail. Repeat offenders were required to have their hair cut and were exiled from the city. Id. at 395.
[27] That statute survived well into the twentieth century. See Oregon Laws, v1, Title XIX, ch. VII, § 2089, p. 1235 (1920).
[28] The term derived from the verb "bawd," which meant "[t]o procure; to provide women for lewd purposes." Webster, 1 An American Dictionary of the English Language (1828).
[1] The Supreme Court summarized the Robertson test in State v. Plowman, 314 Or. 157, 163-64, 838 P.2d 558 (1992), cert den 508 U.S. 974, 113 S.Ct. 2967, 125 L.Ed.2d 666 (1993), as follows:

"In [Robertson ], this court established a framework for evaluating whether a law violates Article I, section 8. First, the court recognized a distinction between laws that focus on the content of speech or writing and laws that focus on proscribing the pursuit or accomplishment of forbidden results. 293 Or. at 416-17, 649 P.2d 569. The court reasoned that a law of the former type, a law `written in terms directed to the substance of any "opinion" or any "subject" of communication,' violates Article I, section 8,
"`unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.' Id. at 412, 649 P.2d 569.
"Laws of the latter type, which focus on forbidden results, can be divided further into two categories. The first category focuses on forbidden effects, but expressly prohibits expression used to achieve those effects. * * * Such laws are analyzed for overbreadth:
"`When the proscribed means include speech or writing, however, even a law written to focus on a forbidden effect * * * must be scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such "overbreadth."' Ibid.
"The second kind of law also focuses on forbidden effects, but without referring to expression at all. Of that category, this court wrote:
"`If [a] statute [is] directed only against causing the forbidden effects, a person accused of causing such effects by language or gestures would be left to assert (apart from a vagueness claim) that the statute could not constitutionally be applied to his particular words or other expression, not that it was drawn and enacted contrary to [A]rticle I, section 8.' Id. at 417, 649 P.2d 569." (Emphasis in original; footnotes omitted.)
[2] Justice Campbell, joined by Justice Linde, concurred only in the result reached by the majority. He wrote that "[w]e granted the petition for review in this case to consider the constitutional issue decided by the Court of Appeals. I would affirm the Court of Appeals on that issue." Id. at 82-83, 698 P.2d 951 (Campbell, J., concurring).
[3] In Henry, the court struck down as facially unconstitutional a statute that prohibited the dissemination of obscene materials after concluding that Article I, section 8, contained no historical exception for obscene expression. 302 Or. at 515-25, 732 P.2d 9.
[4] The state makes no argument in the present case concerning "forbidden effects."
[5] Insofar as "prostitution" is at issue, I address it in the discussion below.
[6] The Oregon territorial statute is An Act to Define Crimes and Misdemeanors and Regulate Criminal Proceedings, chapter 11, section 8 (1854). The majority's reliance on statutes enacted after the adoption of the Oregon Constitution, including General Laws of Oregon, chapter 48, section 632 (Deady 1845-64) (181 Or.App. at 12, 45 P.3d at 457), is misplaced. While laws that were on the books when the constitution was adopted provide appropriate context for a constitutional analysis, laws enacted afterward shed no significant light on the framers' intent.
[7] Although it is not altogether clear, I presume that the majority does not really mean to suggest that any of the activity involved in this case constituted "sexual intercourse." So that my premise is clear, I note that the sexual conduct defendant was convicted of presenting was "masturbation." That term is not defined by statute.
[8] In our opinion on reconsideration in House, as noted above, we struck down a part of ORS 167.062 regarding "touching of the genitals * * * whether alone or between members of the same or opposite sex * * * in an act of apparent sexual stimulation or gratification" but nonetheless did not conclude that both the "sexual intercourse" and "masturbation" portions of the statute were unconstitutional. On reflection, it is entirely unclear how "masturbation" can be meaningfully differentiated from "touching of the genitals * * * in an act of apparent sexual stimulation or gratification," ORS 167.062, much less why it should be differentiated. See Webster's Third New Int'l Dictionary, 1391 (unabridged ed 1993) ("masturbation" includes "stimulation involving the sexual organs * * * achieved by manual or other bodily contact"). To the extent that we may have been suggesting in House that the constitutionality of the touching of genitals in a live performance was dependent upon whether the person whose genitals were touched was enjoying it, I find that distinction unconvincing.
[9] Although their jurisprudence scarcely binds us, our common legal heritage makes worth notingif only in passingthat our Canadian neighbors likely would be perplexed by the majority's sense of historical obligation. In the quest to establish criteria for determining "indecency," the Canadian Supreme Court, in Tremblay v. R., (1993), 2 SCR 932, considered the lawfulness of activities virtually identical to those involved here (except for the activities in the "two girl" shows). The court concluded that the acts were not indecent, noting that both the dancers and the clients knew what to expect, consented to the activities, and were free to leave at will. The court further noted that such a performance in a closed room with only consenting adults present was far different from the same activity carried out in a school yard or public park.
[10] Witness the 1849 Oregon territorial act that prohibited any "negro or mulatto" from entering or residing "within the limits of this territory." Laws of Oregon, § 1 p. 161 (1850).
[11] The thought is absurd only in hindsight:

"Until the 1760's no native professional theater existedno actors, singers, or dancers, and no playhouses. But the demand that did exist divided society. The perennial objection to the theaterharm to moralswas supported by local laws, and the Confederation Congress passed a resolution that classed under `extravagance and dissipation' gambling, horse-racing, cockfighting, and all `shows and plays.'
"The dissipated were nonetheless served by an English troupe with David Douglass as actor-manager. He toured the colonies twice with his repertory of English plays by Farquhar, Mrs. Centilivre, Colley Cibber, and George Lillo, interspersed with ballad operas such as Arne's Love in a Village and Gay's Beggar's Opera. Some of Shakespeare, heavily improved and sometimes offered in thin slices, also figured on the programs. The people of Charleston loved plays and perhaps Boston did too, or why should a law have been passed there in 1750 to prohibit them?" Jacques Barzun, From Dawn to Decadence, 500 Years of Western Cultural Life, 406 (2000).
[12] Although this is not the time to discuss them, I do not suggest that the harmful effects principle is free of its own practical weaknesses and pitfalls. However, it lacks the most obvious conceptual and practical flaws of the historical exception doctrine.
[13] In contrast to the statutes discussed above and for purposes of the prostitution statutes, ORS 167.002(4) defines "sexual conduct" as "sexual intercourse or deviate sexual intercourse." For purposes of the prostitution statutes, ORS 167.002(5) defines "sexual contact" as "any touching of the sexual organs or other intimate parts of a person not married to the actor for the purpose of arousing or gratifying the sexual desire of either party."
[14] While Judge Armstrong makes many good points about the Robertson case in his dissent, his analysis of the constitutionality of ORS 167.012 is unconvincing. He correctly posits that those who engage in expressive conduct while violating a law that is not aimed at expressive conduct are not immune from liability, noting that "a person who commits murder in a theatrical performance is liable for that crime even though the murder was committed solely for expressive purposes." 181 Or.App. at 54-55, 45 P.3d at 480 (Armstrong, J., dissenting). He chooses to treat prostitution (and promoting prostitution) in the course of a performance as somehow "qualitatively different" from murder for purposes of Article I, section 8, analysis. Id. at 55, 45 P.3d at 480. He states that, "[i]f it is lawful to film or produce a live public show in Oregon * * * that includes sexual conduct, * * * then the state cannot apply the prostitution laws to make that conduct unlawful when the performers are paid for their performance." Id. To the extent that Judge Armstrong is positing that drawing a distinction based on whether conduct is done for a fee creates constitutional problems, I respectfully disagree. Prostitution that is not done in the course of a theatrical performance involves the same "conduct" in which people may lawfully engage so long as it is not done "for a fee." ORS 167.007 (defining prostitution). Similarly, it is entirely lawful to give up a baby for adoption. It is a serious felony, however, to sell a baby to adoptive parents. ORS 163.537 (buying or selling a child is a Class B felony). The legislature may define crimes based on whether or not a fee is involved without running afoul of the constitution. It is illogical to posit that prostitution in the course of a theatrical performance cannot be a crime simply because sexual conduct that is not prostitution may lawfully occur in the course of a theatrical performance.
[15] Defendant's theory, carried to its logical extreme, would lead to the conclusion that a political candidate who physically assaulted an opposing candidate during the course of a live debate could not be prosecuted for the assault, because a political debate constitutes protected expression under Article I, section 8, and the assault was an expression of the political disagreement between the candidates.
[1] The distinction makes sense. To the extent that expression causes harm, the legislature is free to write laws that impose restrictions that focus on that harm. See, e.g., Robertson, 293 Or. at 412-18, 649 P.2d 569. Most problems caused by expression can be addressed in that way. Consequently, the legislature generally does not need to look to historical exceptions as a source of authority for laws that address problems caused by expression. That is even more true where, as here, the function of the claimed historical exception was to control people's thoughts and beliefs (and concomitant behavior) by controlling the expression to which they were exposed. The whole point of Article I, section 8, is to prevent the legislature from adopting laws that restrict expression in order to control what people think and believe, yet the majority upholds a law in this case that does precisely that.
[2] The court continued in Deiz:

"[L]egislators are more likely to be concerned with the immediate. We have observed a political temptation to adopt an ideal as an abstract principle and then substantially undercut the ideal in order to accommodate an immediate concern. For example, the political generation that adopted the first amendment also attempted to suppress political criticism by enacting the Alien and Sedition Acts."
Deiz, 289 Or. at 284, 613 P.2d 23.
[3] The court went on to note in Freeman that "`any more restrictive rule could annihilate in a stroke much of the modern theater and cinema.'" Freeman, 46 Cal.3d at 426, 250 Cal.Rptr. 598, 758 P.2d 1128 (quoting Barrows v. Municipal Court, 1 Cal.3d 821, 831, 464 P.2d 483, 83 Cal.Rptr. 819 (1970)); cf. Wooten v. Superior Court, 93 Cal.App.4th 422, 113 Cal.Rptr.2d 195 (2001), rev. den. (Cal 2002) (managers of strip club not liable for prostitution-related crimes for sexual acts performed between paid performers).
[4] The analysis that I apply here is analogous to the analysis that I believe applies under the Oregon Constitution to a claim that an otherwise valid law cannot be applied to prevent a person from complying with the requirements of her religion. A law against murder properly can apply to prevent a person from complying with a religious command to engage in human sacrifice. However, the constitutional guarantee of religious liberty might prevent the state from requiring a licensed driver to have her photograph on her driver license if the requirement would violate her religious beliefs. See, e.g., Quaring v. Peterson, 728 F.2d 1121 (8th Cir.1984). Similarly, it would prevent the state from requiring a person to pledge allegiance to the Oregon flag if doing so would require the person to violate her religious beliefs. See, e.g., Board of Education v. Barnette, 319 U.S. 624, 626-30, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). There is no obvious line that can be drawn between general laws that can be enforced notwithstanding religious beliefs and those that cannot. Nevertheless, I believe that the Oregon religious liberty guarantees embody such a distinction, which, as I have said, is equivalent to the distinction that Article I, section 8, creates between generally applicable laws that can apply to expressive conduct and those that cannot.

In rejecting my analysis, Judge Brewer notes that Oregon law permits parents to place their children for adoption but prohibits them from selling their children to others, which is another example besides the prostitution laws of a law that makes conduct criminal because the conduct involves the payment of money. 181 Or. App. at 47 n. 14, 45 P.3d at 476 n. 14 (Brewer, J., concurring in part, dissenting in part). Of course, you can pay actors to stage a scene in which they purport to sell their child without violating the law against selling children. In contrast, the laws prohibiting prostitution are the only laws of which I am aware that would prevent a filmmaker or theater producer from paying actors to portray conduct that would be lawful but for the fact that the actors are paid to portray it. Given the realities of film and theater production, in which actors generally must be paid, the enforcement of the prostitution laws against the people involved in that work means that expressive works involving sexual conduct cannot be produced. The unique conflict between the prostitution laws and the ability of people to create film and theatrical works using paid actors to portray sexual conduct leads me to conclude that Article I, section 8, bars the state from enforcing the prostitution laws against producers and actors involved in expressive work that includes sexual conduct that is lawful but for the payment of the actors. As noted above, the California Supreme Court reached the same conclusion under the First Amendment in Freeman.
Furthermore, I do not doubt that, if the state enacted a law that made it a crime to pay or receive money for an adult to be nude in the company of adults to whom the nude adult was not related, then Article I, section 8, would bar enforcement of that law against dancers, models, photographers, and artists involved in the creation of expressive works. I believe that the same principle applies to the prostitution law at issue in this case.